# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

_____

| | | |
|---|---|---|
| ANCIENT COIN | : | |
| COLLECTORS GUILD | : | |
| 206 Elm Street | : | |
| Gainesville, MO  65655 | : | |
| | : | |
| Plaintiff, | : | Case No. |
| vs. | : | |
| | : | |
| U.S. CUSTOMS AND | : | |
| BORDER PROTECTION, | : | **JURY TRIAL DEMANDED** |
| DEPARTMENT OF | : | |
| HOMELAND SECURITY | : | |
| Ronald Reagan Building and | : | |
| International Trade Center | : | |
| 1300 Pennsylvania Avenue, N.W. | : | |
| Washington, D.C. 20004; | : | |
| | : | |
| COMMISSIONER, | : | |
| U.S. CUSTOMS AND | : | |
| BORDER PROTECTION, | : | |
| Ronald Reagan Building and | : | |
| International Trade Center | : | |
| 1300 Pennsylvania Avenue, N.W. | : | |
| Washington, D.C. 20004; | : | |
| | : | |
| UNITED STATES DEPARTMENT | : | |
| OF STATE | : | |
| 2201 C Street, N.W. | : | |
| Washington, D.C.  20520; | : | |
| | : | |
| and | : | |
| | : | |
| ASSISANT SECRETARY OF | : | |
| STATE (EDUCATIONAL AND | : | |
| CULTURAL AFFAIRS), | : | |
| UNITED STATES DEPARTMENT | : | |
| OF STATE | : | |
| 2201 C Street, N.W. | : | |
| Washington, D.C.  20520 | : | |
| | : | |
| Defendants. | : | |

_____

1

**COMPLAINT**

Plaintiff Ancient Coin Collectors Guild ("Plaintiff" or "ACCG"), by its attorneys, Bailey & Ehrenberg PLLC, allege as follows:

**NATURE OF THE ACTION**

1. This is an action to recover twenty-three (23) common ancient coins ("the collectors' coins"), and, in so doing, to test the legality of certain import restrictions promulgated by Defendants U.S. Customs and Border Protection ("Customs") and the United States Department of State ("State") designed to bar entry into the United States of ancient coins of Cypriot and Chinese type of the sort widely and freely collected world-wide, including in Cyprus and China.

2. In so doing, ACCG requests the Court: (a) to declare that the decision to impose import restrictions on ancient coins of Cypriot type is arbitrary and capricious because, pursuant to applicable law, State failed to disclose to Congress a rational basis for the reason, or reasons, behind State's  decision to reject the advice of its own advisory committee and also in departing from prior agency practice; (b) to declare that the decisions to impose import restrictions on ancient coins of both Cypriot and Chinese type are also arbitrary and capricious because they are both contrary to law and the product of bias, prejudgment and *ex parte* contact; and (c) to declare that under the applicable statutes Customs must prove that the Cypriot or Chinese coins at issue were illicitly removed from Cypriot or Chinese find spots before they may be forfeited.

3. As set forth more fully below, ACCG imported the collectors' coins on or about April 15, 2009, Customs detained the collectors' coins on or about April 24, 2009, or over nine (9) months ago, and Customs seized the collectors' coins on July 20, 2009, or over six (6) months ago.  Upon information and belief, as of the date for filing this Complaint, the United

States has not filed a forfeiture action against the collectors' coins, which would allow ACCG to contest their seizure in Court.  As such, in bringing this action, ACCG also seeks to vindicate one of the foundational principles of American law:  that government may not unilaterally deprive its citizens of their property and possessions without promptly affording them the process due and required under our Constitution, statutes and common law.

## **JURISDICTION AND VENUE**

4.   This action is brought pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.,* (hereinafter the "APA"), the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Mandamus and Venue Act, 28 U.S.C. § 1361, for vindication of rights under the Civil Asset Forfeiture Reform Act of 2000, 18 U.S.C. § 983 (hereinafter "CAFRA"), as well as the Fifth Amendment of the United States Constitution.

5.   This action also seeks the Court to declare under the APA, the Declaratory Judgment Act and the Mandamus and Venue Act, that import restrictions imposed on ancient coins of Cypriot and Chinese type pursuant to the Convention on Cultural Property Implementation Act, 19 U.S.C. § 2600 *et seq.,* (hereinafter the "CPIA") are either arbitrary, capricious and contrary to law or wrongfully applied by Customs to seize coins that cannot be traced back to illicit excavations in either the Republic of Cyprus ("Cyprus") or the People's Republic of China ("China").

6.   This Court has jurisdiction under 28 U.S.C. §§ 1331, 1346, and 1361; under 5 U.S.C. § 702; and by virtue of its inherent equitable powers.

7.   Venue is proper in the United States District Court for the District of Maryland under 28 U.S.C. §§ 1391, 1395.

## THE PARTIES

8.  Plaintiff ACCG is a Missouri based non-profit organization committed to promoting the free and independent collecting of coins from antiquity.  ACCG strives to achieve its goals through education, political action, and consumer protection.  Membership of the ACCG is comprised of collectors and numismatic professionals who care passionately about preserving, studying and displaying ancient coins from all cultures.  ACCG purchased the collectors' coins in London, England, is the legal owner of the collectors' coins, and is entitled to their use and enjoyment.  In importing the collectors' coins and contesting their seizure, ACCG is acting on behalf of collectors and the small businesses of the numismatic trade who typically cannot financially afford to contest Customs seizures due to the low value of most ancient coins and the high cost of legal services.

9.  Defendant Customs is an agency of the Executive branch of the United States Government within the Department of Homeland Security, having responsibility for enforcing our nation's customs laws, including import restrictions under the CPIA imposed on ancient coins of Cypriot and Chinese type.  Upon  information and belief, Customs typically defers to State with regards to decisions to impose import restrictions under the CPIA, and, at least in some cases, whether to pursue individual forfeiture actions against artifacts detained under the CPIA and other laws.

10. Defendant Commissioner of Customs and Border Protection ("Commissioner of Customs") acts as the head of Defendant Customs.  Upon information and belief, Alan Bersin has been nominated to fill this post, but the Senate has yet to confirm him and Dan Aguilar now serves as Acting Commissioner of Customs.

11. Defendant State is an agency of the Executive branch of the United States Government having primary responsibility for deciding whether and to what extent to impose import restrictions under the CPIA.

12. Defendant Assistant Secretary of State (Educational and Cultural Affairs) ("the Assistant Secretary, ECA") heads the Bureau of Educational and Cultural Affairs ("ECA"), a component of Defendant State.   Upon information and belief, Judith Ann Stewart Stock has been nominated to fill this post and confirmation hearings have been held, but the entire Senate has yet to confirm her and in the interim Judith McHale, Under Secretary for Public Diplomacy and Public Affairs, oversees ECA directly.   At all relevant times, the Assistant Secretary, ECA acted as the President's designee for decisions to impose import restrictions on cultural artifacts.   As part of the decision making process under the CPIA, the Cultural Property Advisory Committee ("CPAC") makes recommendations to the Assistant Secretary, ECA on a proper balance between efforts to control looting at archaeological sites and the legitimate international exchange of cultural artifacts.   Although CPAC is separately constituted under the CPIA, the ECA's Cultural Heritage Center acts as its secretariat.

## STATEMENT OF FACTS

### *Ancient Coins and Ancient Coin Collecting*

13. Western coinage originated in Asia Minor sometime around the 7th c. B.C.   This innovation soon spread to the Greek mainland and islands like Cyprus.   The first true Cypriot coins date from the late 6th c. B.C., when various Cypriot kingdoms began to issue coin types derived from designs on coins from the East that had arrived on Cyprus in trade.   Subsequently, the Persian Empire, Alexander the Great, the Ptolemaic Kingdom

and the Romans struck coins on the Island, which were often indistinguishable from coins struck at their other imperial mints.

14. Because Cyprus is located on an important trade route, coins minted in Cyprus circulated widely around the Mediterranean region and even as far away as Afghanistan. Accordingly, it is impossible to determine a Cypriot coin's find spot merely from identifying it as being made in a Cypriot mint.

15. Coinage began in China in the late 7th or early 6th c. B.C. The earliest money was cast into the form of spades, knives or cowry shells. Ultimately, by around 221 B.C., a round bronze coin marked with Chinese characters and featuring a square center hole became standardized. These "cash" coins were produced in immense numbers from roughly 221 B.C. to 1912 A.D. This type was widely emulated from Central Asia to Japan, with similar types being cast in Vietnam as late as 1933.

16. The circulation patterns of Chinese cash coins were equally wide, with such coins being exported in quantity from the Fifth to Tenth Centuries to East Africa, the Persian Gulf, India, Ceylon, Burma, Thailand, Vietnam, Malaya, the Philippines, Sumatra, Java and Borneo. Later on, Chinese immigrants even took such coins with them to the United States. Accordingly, it also is impossible to determine a Chinese coin's find spot merely from identifying it as being made in a Chinese mint.

17. Historical coins have actively been traded for at least 500 years as collectibles. Due to their usual modest value and the huge numbers extant, historical coins are typically traded without any provenance information or documentary history as to where and when they were found.

18. As a result, it is therefore, unreasonable to assume that a coin is "stolen," "illegally exported," or "illegally imported" merely because the holder cannot establish a chain of custody beyond receipt from a reputable source.

19. All coin collectors share a desire to preserve, study and display their coins, as part of their love for history and appreciation of ancient cultures.  Americans have specifically enjoyed collecting ancient coins for generations.  President John Quincy Adams was a serious, early American collector of ancient coins.  Many other Americans enjoy collecting at least some ancient coins.  Such individuals have included Presidents Thomas Jefferson, Theodore Roosevelt, Ronald Reagan and, upon information and belief, William Jefferson Clinton. Though there are some very wealthy collectors, most collectors are of relatively modest means.

20. Collectors in Cyprus, the rest of the European Union (the "EU") and China share the interest of collectors in the United States in collecting ancient coins.  On information and belief, such collectors in Cyprus, the rest of the EU and in China also openly enjoy collecting and importing ancient coins without any known provenance information.

*The UNESCO Convention and the CPIA*

21. In or about 1970, the UNESCO Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property ("the 1970 UNESCO Convention") was promulgated.  Broadly speaking, the 1970 UNESCO Convention contemplates that governments will enter into agreements to enforce each other's cultural property laws.

22. In 1972, the U.S. Senate ratified the 1970 UNESCO Convention subject to reservations intended to preserve the "independent judgment" of the United States Government as to whether, and as to what extent, to impose import restrictions on cultural artifacts at the behest of State Parties to the 1970 UNESCO Convention.

23. Upon information and belief, the Senate was concerned about foreign governments taking advantage of the 1970 UNESCO Convention to pursue their own cultural nationalistic agendas to the disadvantage of American citizens and institutions.

24. "Cultural Nationalism" is a form of nationalism in which the nation is defined by its shared (inherited) culture. Cultural nationalists hold that artifacts "belong" within the physical boundaries of the nations in which they are found or with which they are typically associated. Cultural nationalist states, like Cyprus, China and Italy, typically claim legal title to all artifacts, including common ones like coins, found in the ground of their territory. On the other hand, such countries, like Cyprus, China and Italy, also encourage their own citizens to possess collections of artifacts of their own cultures, particularly if these citizens reclaim such artifacts from abroad by purchase.

25. The 1970 UNESCO Convention is not self-executing. In 1983, Congress passed the CPIA to enact the 1970 UNESCO Convention under U.S. law. As set forth in the CPIA's legislative history, Congress sought to limit the "Cultural Nationalist" reach of State Party requests under the 1970 UNESCO Convention:

> The [Senate Finance] Committee intends these limitations to ensure that the United States will reach an independent judgment regarding the need and scope of import controls. That is, U.S. actions need not be coextensive with the broadest declarations of ownership and historical or scientific value made by other nations. U.S. actions in these complex matters should not be bound by the characterization of other countries, and these other countries should have the benefit of knowing what minimum showing is required to obtain the full range of U.S. cooperation authorized by this bill.

*See* S. Rep. No. 97-564, at 27 (1982), reprinted in 1982 U.S.C.C.A.N. 4078, 4099.

26. The CPIA contemplates that State Parties to the 1970 UNESCO Convention will initiate any request for import restrictions and that such requests can only relate to artifacts as to which that State Party has already promulgated export controls. CPIA, 19 U.S.C. § 2602 (a) and § 2601 (2) (C).

27. Once such a request is made, the CPIA places certain limitations on the ability of the Executive branch to impose import restrictions on cultural artifacts.  These include provisions requiring: (a) that the restricted artifacts were "first discovered within" the State Party  seeking restrictions (CPIA, 19 U.S.C. § 2601 (2) (C)); (b) that the restricted artifacts are of "cultural significance"(CPIA, 19 U.S.C. § 2601 (2) (C) (i) (I))); (c) that less drastic remedies than import restrictions are unavailable (CPIA, 19 U.S.C. § 2602 (a) (1) (C) (ii)); and (d) that any restrictions are part of a "concerted international response" of other State Parties to the 1970 UNESCO Convention.  CPIA, 19 U.S.C. § 2602 (a) (1) (C) (i).

28. As part of exercising this independent judgment under the CPIA, the Assistant Secretary, ECA receives recommendations from CPAC in the form of a report setting forth: (a) the results of its investigation and review; (b) its findings as to the nations individually having a significant trade in the relevant material; and (c) CPAC's recommendation as to whether an agreement should be entered into, together with its reasoning.  CPIA, 19 U.S.C. § 2605 (f) (1).  In addition, when import restrictions are recommended, the CPAC report must include: (a) any terms and conditions CPAC recommends for such agreements; and (2) a listing of archaeological or ethnological material, specified by type or such other classification as CPAC deems appropriate, which should be covered by any such agreement.  CPIA, 19 U.S.C. § 2605 (f) (4).

29. If import restrictions are recommended, Customs must by regulation designate the material restricted, by type or classification, but shall ensure that the list is sufficiently specific and precise to ensure that the material is *only applied* to the material covered by any agreement to impose import restrictions. CPIA, 19 U.S.C. § 2604 (1) (emphasis added).

30. Once imposed, import restrictions under the CPIA bar entry of designated artifacts not accompanied by detailed certifications concerning the artifacts' whereabouts at the time the restrictions were imposed or an export permit from the State Party that requested the restrictions.   CPIA, 19 U.S.C. § 2606.

31. In practice, such certifications are difficult to procure, particularly for items of modest value like coins which are typically traded without provenance documentation.

*32.* Upon information and belief, though Cyprus allows imports of cultural artifacts for the enjoyment of Cypriot collectors, Cyprus does not provide export permits for collectors to remove Cypriot artifacts from the country legally.

*Efforts to Extend Import Restrictions to Ancient Coins*

33. On or about January 28, 1999, CPAC first considered and later recommended against imposing import restrictions on coins, as part of a larger request for import restrictions on cultural artifacts made by Cyprus, a State Party to the 1970 UNESCO Convention.

34. On or about October 12, 1999, CPAC considered import restrictions on ancient artifacts from Italy, another State Party, including coins.   Sometime thereafter, CPAC recommended against restrictions on coins of Italian type.   *See* Report of the Cultural Property Advisory Committee on the Request from the Government of Italy Recommending U.S. Import Restrictions on Certain Categories of Archaeological Material (Feb. 7, 2000).

35. On or about January 23, 2001, Defendants adopted CPAC's recommendations and exempted ancient coins from import restrictions imposed on cultural artifacts from Italy.  *See* 66 Fed. Reg. 7399-7402 (Jan. 23, 2001).

*36.* On or about July 19, 2002, CPAC's recommendations against import restrictions on coins of Cypriot types were adopted by the State Department.  *See* 67 Fed. Reg. 47447-47450 (Import Restrictions Imposed on Pre-Classical and Classical Archaeological Material Originating in Cyprus).

37.  On or about May 27, 2004, the United States received a request for import restrictions from China, another State Party to the 1970 UNESCO Convention.  The Federal Register Notice did not appear until September 3, 2004.  That Federal Register Notice makes mention of import restrictions on several categories of archaeological artifacts, but makes no specific mention of import restrictions on coins.  *See* 69 Fed. Reg. 53970 (Sept. 3, 2004).

38. In or about November 2004, ECA's Cultural Heritage Center placed a summary of China's Request for import restrictions on its web site.   Unlike the Federal Register notice, the summary indicated that China sought import restrictions on coins, albeit in a one word reference, at the end of an eleven (11) page explanation detailing the need for restrictions to be placed on other artifacts.

39. Upon information and belief based primarily on information received in response to FOIA requests, China never formally requested import restrictions on coins.

40. On February 17, 2005, CPAC conducted a hearing to consider China's request for import restrictions.   Upon information and belief, the ACCG and others noted: (a) that ancient Chinese coins are extremely common with individual types known from numerous examples; (b) that ancient Chinese coins circulated far from China; (c) that demand for Chinese coins in

the U.S. is minimal while internal Chinese demand for such items is large; (d) that the Bank of China and other Chinese companies regularly sell large numbers of coins of the sort for which restrictions were requested; (e) that less drastic remedies like the establishment of a "treasure trove" scheme were not considered; (f) that the "concerted international response" requirement had not been met.

41. In prepared testimony, ACCG also stated, "Oddly enough, one of the wealthiest capitalists in China has made a fortune selling Chinese coins - not to collectors, but to tourists.  According to a Forbes article, Wang Gang's business associate is the state run Bank of China.  He reportedly owns some 500 tons of ancient coins, estimated at about 90 million pieces and representing about 70% of China's supply.  It seems ludicrous that the Bank of China would sell genuine ancient Chinese coins to tourists, and then ask the U.S. to restrict these same coins."  ACCG Written Testimony, dated February 17, 2005 at 2.

42. Upon information and belief, the Archaeological Institute of America ("AIA") is a nonprofit group that promotes professional archaeology. Upon further information and belief, although the AIA maintains it has some 200,000 members, this figure is derived from the circulation of its magazine, *Archaeology.*  In contrast, upon further information and belief, a small number of professional archaeologists – many of whose careers are dependent on excavation permits issued by Cultural Nationalist states like China, Cyprus and Italy—actually govern the AIA and formulate its public stances.  According to one such pronouncement, the AIA maintains that all unprovenanced artifacts should be deemed to be "stolen" and repatriated to their supposed countries of origin.  *See* http://www.archaeological.org/webinfo.php?page=10421 ("Q: Should all antiquities be

repatriated?    A: No, not if they are legally obtained and well-provenanced and documented.").

43. On September 8, 2005, CPAC held another hearing to consider the renewal of import restrictions on Italian cultural artifacts.  At that hearing, it was unclear whether Italy had requested State to extend import restrictions on coins.  It was clear, however, that representatives of the AIA, requested CPAC to include coins in any renewal of import restrictions on Italian cultural artifacts.

44. Upon information and belief, the Cyprus American Archaeological Research Institute ("CAARI") is a nonprofit group formed to promote the study of Cypriot archaeology and related disciplines.  Upon further information and belief, the careers of many CAARI associated archaeologists are dependent upon the Cypriot Department of Antiquities issuing them excavation permits.  Upon further information and belief, CAARI also maintains that all unprovenanced artifacts should be deemed to be "stolen" and repatriated to their supposed countries of origin.

45. In or about November 2005, Dr. Pavlos Florentzos, Director of the Cyprus Department of Antiquities, visited the United States at the invitation of CAARI and with the support of the U.S. Embassy in Cyprus.  During this time, CAARI facilitated a meeting between Florentzos and employees of ECA's Cultural Heritage Center, including its Executive Director, Maria Kourpoupas, and a staff archaeologist. *See* J. Green, *Cyprus Director of Antiquities, Dr. Pavolos Flourtzos, Visits the U.S.,* 31 CAARI News 3 (Winter 2006) (available online at: http://www.caari.org/newsletters/CAARI-News-31.pdf).

46. Upon information and belief, CAARI has benefited from direct and/or indirect financial and/or material support from State, the Government of Cyprus and Cypriot entities, including the Bank of Cyprus Cultural Foundation.

47. Upon information and belief, the Bank of Cyprus Cultural Foundation was established to rescue the Island's cultural heritage, which the Foundation maintains was pillaged and destroyed by Turkish forces when they occupied the Northern part of the Island.   Upon further information and belief, the Bank of Cyprus Cultural Foundation maintains one of the largest collections of ancient coins of Cypriot type within Cyprus.   Upon further information and belief, the Bank of Cyprus Cultural Foundation purchases unprovenanced coins on the open market for its collection of the sort now subject to U.S. import restrictions on coins of Cypriot type.

48. On January 19, 2006, State announced a five (5) year renewal of its Memorandum of Understanding (MOU) with Italy relating to cultural artifacts.   Once again, ancient coins struck in Italy were exempted from import restrictions.

49. On December 7, 2006, the Federal Register carried a notice indicating that CPAC would conduct a review of the MOU with Cyprus.   That notice invited public comment to be submitted no later than January 11, 2007.   The Federal Register notice contained no mention of an effort to extend new restrictions to coins. *See* 71 Fed. Reg. 71015-71016 (Dec. 7, 2006).

50. On December 8, 2006, Principal Deputy Assistant Secretary, ECA Miller Crouch indicated in a response to an e-mail inquiry that he "d[id] not anticipate" that new restrictions on coins would be addressed at CPAC's hearing to consider the renewal of the MOU with Cyprus.

14

51. On December 14, 2006, two numismatic trade associations filed a request with State to recuse CPAC member Joan Connelly from voting on any last minute effort to impose import restrictions on ancient Cypriot coins.   That recusal request noted that Dr. Connelly excavated in Cyprus and had publicly thanked "the Department of Antiquities of Cyprus, its Director, Dr. Demos Christou and the Ministry of Communication and Works, Republic of Cyprus, for granting us the license to excavate on Yeronisos Island."

52. On January 12, 2007, State summarily denied the recusal request.

53. On January 17, 2007, according to a heavily redacted document released in response to a FOIA request, a State ECA Cultural Heritage Center staff archaeologist conferred with the late Dr. Danielle Parks, an archaeologist associated with the CAARI, about the inclusion of coins in the Cypriot request.

54. On January 19, 2007, according to a document released in response to a FOIA request, Cyprus requested State to amend the designated list of artifacts subject to import restriction to include coins of Cypriot type.

55. On January 25, 2007, CPAC conducted a public hearing on the renewal of the MOU with Cyprus.   At that hearing, CPAC Chairman Jay Kislak announced that he had learned that Cyprus had requested that State amend the designated list of Cypriot artifacts subject to import restrictions to include coins of Cypriot type.

56. Upon information and belief, at that same hearing, neither Cypriot authorities nor members of the archaeological community could point to any material change of fact justifying a change in the exemption from import restrictions on Cypriot coins.

57. On January 26, 2007, in response to complaints about the lack of public notice for the inclusion of coins in the Cypriot request, State announced an additional ten (10) day

comment period. State made this announcement on the Cultural Heritage Center website and not in the Federal Register.   Nevertheless, during this extremely short time frame, numismatic groups generated over 1100 letters opposing the extension of import restrictions to coins.

58. Upon information and belief, comments provided by ACCG and others established: (a) that Cypriot coins were common, with many known examples of coin types struck on the Island; (b) that Cypriot coins travelled widely so that one could not assume that a coin struck in Cyprus was found there; (c) that less drastic remedies like the imposition of a treasure trove law and/or the regulation of metal detectors should be tried before import restrictions were considered; (d) and that the CPIA's "concerted international response" requirement could not be met.

59. Upon information and belief CAARI, the AIA, the Bank of Cyprus Cultural Foundation, and the late Dr. Danielle Parks submitted comments supporting import restrictions at the behest of Cyprus.

60. In a letter dated February 5, 2007, the AIA's president claimed that it was proper to assume that coins of Cypriot type can be assumed to have Cypriot find spots, because "Coins minted on Cyprus were very rarely taken from the island in antiquity."

61. On May 2, 2007, Assistant Secretary of State, ECA Dina Powell, the decision maker for the extension of the MOU with Cyprus announced her departure to become the Director for Global Corporate Engagement at Goldman Sachs. *See* http://en.wikipedia.org/wiki/Dina_Powell.

62. Upon information and belief, Goldman Sachs is a bank holding company with worldwide business interests, likely including relationships with Cyprus or Cypriot entities like the Bank of Cyprus.

63. On or about May 7, 2007, according to a document released in response to a FOIA request, CPAC issued its report making its recommendations concerning the extension of the MOU with Cyprus.

64. On or about May 14, 2007, according to a document released in response to a FOIA request, Pavolos Flouretzos, Director, Cypriot Department of Antiquities, admitted in a private communication to State, "It is true that Cypriot coins shared the same destiny as all other coins of the ancient world.  As a standard media of exchange they circulated all over the ancient world due to their small size, which facilitated their easy transport… The continuous circulation of coins for many centuries amongst collectors and between collectors and museums make any attempt to locate their exact find spot extremely difficult."

65. On or about May 16, 2007, Undersecretary of State Nicholas Burns, upon information and belief the third ranking official at State, accepted an award from Greek and Greek Cypriot advocacy groups as these groups lobbied the State policy makers. According to a press release, "Undersecretary of State Nicholas Burns was the first Philhellene to receive the Livanos Award. This award is given each year to, as its states on the award, 'that individual who, like George P. Livanos, has utilized ancient Hellenic values to realize extraordinary achievement in modern society while contributing to the improvement of our civilization.'" *See* http://news.pseka.net/uploads/img/documents/PSEKA-SAE_2007_Conference_EN_01_CEH_01.pdf.

17

66. On or about May 16, 2007, State's news service quoted Burns as stating on receipt of the Livanos award, "I wear this title of Philhellene rather proudly. You don't spend four years in Greece, as my wife and three daughters and I did, and not come back feeling committed to Greek thought, to the Greek way of life, to Greece itself in my case....We're personally committed to the country, to the relationship."

67. On May 17, 2007, according to a document released in response to a FOIA request, Kurt Volker, Acting Assistant Secretary of State, Bureau of European and Eurasian Affairs, wrote the Assistant Secretary, ECA Dina Powell, stating "[G]iven our general support for protection of antiquities and the importance of this MOU to our bilateral relations with Cyprus, EUR strongly recommends that ECA approve the renewal of the MOU and include the protection of coins."

68. On May 29, 2007, according to a document released in redacted form in response to a FOIA request, Principal Deputy Assistant Secretary, ECA Miller Crouch wrote an "Action Memo" to the decision maker Assistant Secretary, ECA Dina Powell regarding the extension of the MOU with Cyprus.  That Action Memo only provides the decision maker with the false choice of approving the import restrictions including coins in their entirety or disapproving them in their entirety.  The Action Memo does not provide the decision maker the option of continuing the then current import restrictions without extending them to coins.

69. On May 30, 2007, according to that same document, Assistant Secretary of State Dina Powell signed off on that action memo that authorized import restrictions on ancient coins of Cypriot type.

70. On July 13, 2007, State and Customs formally extended import restrictions to coins of Cypriot Types.  *See* Extension of Import Restrictions Imposed on Pre-Classical and Classical

Archaeological Objects and Byzantine Period Ecclesiastical and Ritual Ethnological Material from Cyprus, 19 CFR Part 12, reported at 72 Fed. Reg. 38470-74 (July 13, 2007).

71. On July 16, 2007, the MOU renewal with Cyprus was signed.  That MOU fails to suggest that restrictions under the agreement satisfy the CPIA's requirements, including the requirement "concerted international response" requirement or the requirement that less drastic remedies than import restrictions on coins are available.

72. On July 19, 2007, Undersecretary Nicholas Burns conducted a signing ceremony for the MOU to coincide with Greek and Greek Cypriot lobbying efforts on Capitol Hill and at the State Department itself.  Upon information and belief, representatives of CAARI were invited to this signing ceremony.

73. The official transcript of the Cyprus MOU signing ceremony omits several significant words. In the transcript, Ambassador Kakouris of Cyprus is reported as saying, "In fact, I was reminded just before we came in about something that I had said in January when we were before the Committee and responding to someone very much on the side of the coin collectors who -- talked about the hobby of collecting coins. And I said to him: 'It may be your hobby, but it's our heritage!" and that is the way that we look at this issue.'"

74. In fact, what Kakouris actually said can be heard (at 10:09 of the audio).  There, he states, "In fact, I was reminded *by [Cultural Heritage Center ED] Maria Kouroupas* just before we came in about something that I had said in January when we were before the Committee and dealing with the coin collectors and somebody who was very much on their side, when he talked about the hobby of collecting coins.  And I said to him: 'It may be your hobby, but it's our heritage!" and that is the way that we look at this issue.'" (Emphasis added.)

75. On July 20, 2007, State issued a press release about the MOU.  That press release stated, "With the extension of this MOU, DHS amended the designated list of restricted categories to include ancient coins of Cypriot types produced from the end of the 6th century B.C. to 235 A.D. Coins, a significant and inseparable part of the archaeological record of the island, are especially valuable to understanding the history of Cyprus. *This extension of the MOU is consistent with the recommendation of the Cultural Property Advisory Committee, which is administered by the Bureau for Educational and Cultural Affairs*."  (Emphasis added.)

76. On August 29, 2007, State sent a report mandated under the CPIA to Congress.  Under 19 U.S.C. §  2602 (g)(2), that report is required to: (a) describe the actions taken; (b) whether there were any differences between those actions and CPAC's recommendations; and, (c) if so, the reasons for those differences.   That report, however, contains no indication whether State rejected CPAC recommendation against import restrictions on coins, and, if so, why?  In addition, that report also suggests that Customs and not State made the decision to impose import restrictions on coins.

77. In or about May-June 2008, the Cyprus News Service quoted CAARI's president as stating, "CAARI has been in the forefront of the successful effort to renew the Memorandum of Understanding between Cyprus and the USA restricting the import of Cypriot antiquities into the United States….."  *See* http://www.caari.org/CAARIat30.htm.

78. On January 16, 2009, the Federal Register announced import restrictions on Chinese cultural artifacts, including those on early media of exchange to Tang era cash coins.  *See* 19 CFR Part 12, reported at 74 Fed. Reg. 2838-2844 (Jan. 16, 2009).

79. On April 20, 2009, past CPAC Chairman Jay Kislak signed a declaration in FOIA litigation that stated in pertinent part:

> o *I am told that Section 303 (g) of the CPIA requires the State Department to report to Congress any differences between CPAC's recommendations and the State Department's ultimate decision to impose import restrictions. In this regard, the release of the most recent CPAC report related to Cyprus and its discussion about coins could clarify misleading information contained in official State Department documents.*
>
> o *I specifically recall the Cypriot request that then current import restrictions on other cultural artifacts be extended to coins was a matter of great public controversy. CPAC considered the question specifically and I recall a special vote being taken on this particular issue.*
>
> o *With that in mind, I have reviewed both an official State Department Press Release and a State Department report made pursuant to CPIA Section 303 (g) about the MOU with Cyprus...I believe it is absolutely false to suggest in those materials that the State Department's decision to extend import restrictions to ancient coins was consistent with CPAC's recommendations. The full release of CPAC's recommendations with regard to coins could be in the public interest because it should clarify misleading information contained in official State Department documents.*

80. On November 13, 2009, at a public interim review of import restrictions on Italian cultural artifacts, archaeologists associated with the AIA and the Italian Ministry of Culture argued to CPAC that import restrictions should be extended to coins struck in Italy based on the Cypriot precedent.

81. Upon information and belief, the Bank of Cyprus Cultural Foundation and collectors in Cyprus have materially benefitted from the imposition of U.S. import restrictions because they (like other collectors in the EU and worldwide) now enjoy a competitive advantage over U.S. collectors who must contend with difficult to meet provenance requirements on the Cypriot coins they import pursuant to current Customs regulations and practices.

82. Upon information and belief, collectors in China have materially benefitted from the imposition of U.S. import restrictions because they (like other collectors worldwide) now enjoy a competitive advantage over U.S. collectors who must contend with difficult to meet provenance requirements on the Chinese coins they import pursuant to current Customs regulations and practices.

21

*The CPIA and CAFRA*

83. The CPIA states, "[a]ll provisions of law relating to seizure, forfeiture and condemnation for violation of the customs laws shall apply to seizures and forfeitures, incurred or alleged to have been incurred, under this chapter, insofar as such provisions of law are applicable to, and not inconsistent with, the provisions of this chapter."  19 U.S.C. § 2609.

84. On April 25, 2000, the Civil Asset Forfeiture Reform Act ("CAFRA"), Pub. L. No. 106-185, 114 Stat. 202, became law.

85.  Congress enacted the legislation with the specific purpose of curbing government abuses in confiscating the property of private individuals.  Congressman Henry Hyde said that "this legislation revives the notion that property, like the individuals charged with crimes, is innocent until proven guilty."  *See* Rep. Henry Hyde, *Now's the Time to Change the Law that Allows Police to Confiscate Your Property Without Recourse,* USA Today (July 11, 1995).

86. Congress passed CAFRA as a direct response to the government's due process abuses under the former civil forfeiture laws.  Congress enacted a system of procedural safeguards to ensure protection from arbitrary confiscations by the government.  The legislative history reflects Congress' intention to prevent the government from retaining property subject to forfeiture for an extended period without commencing a judicial action to give claimants their day in court.

87. Of particular relevance to this case, CAFRA radically altered the burden of proof in civil forfeiture actions.  Under prior law, the government had the burden merely of establishing probable cause to believe that the property was subject to forfeiture, and could meet that burden with hearsay evidence.  Once that showing was made, the burden shifted to the claimant to prove by a preponderance of the evidence that the property was lawfully his or

hers.  Following the enactment of CAFRA, the burden of proof was effectively reversed, such that the government—not the claimant—is now required to prove by a preponderance of non-hearsay evidence that the property is subject to forfeiture.  18 U.S.C. § 983 (c).

88. CAFRA thus made it significantly more difficult for the government to lawfully obtain forfeiture of property claimed to be owned by collectors, the small businesses of the numismatic trade or entities like ACCG.

*Customs Seizes the Collectors' Coins*

89. On or about July 4, 2009, ACCG purchased the collectors' coins in London, England. The collectors' coins consisted of twenty three (23) ancient Chinese and Cypriot coins valued at $275.00.  Upon information and belief, certain of the Chinese coins were sourced to Canada.

90. As is typical for the vast majority of historical coins on the international numismatic market and in collections such as that of the Bank of Cyprus Cultural Foundation, the collectors' coins have no known provenance.  ACCG has no knowledge where or when the collectors' coins were found.

91. On April 15, 2009, ACCG imported the collectors' coins via a British Airways flight to Baltimore, Maryland where ACCG's customs broker presented the Collectors' coins to Customs.

92. On or about April 24, 2009, Customs detained the collectors' coins.

93. On July 20, 2009, Customs seized the collectors' coins which it described as 3-Knife shaped coins, 12-Chinese coins and 7-Cyprus coins.

94. On August 26, 2009, Customs wrote to ACCG's counsel to report the seizure of the collectors' coins.

95. On September 3 and 8, 2009, ACCG asserted a claim to the collectors' coins and provided Customs with a cost bond to secure any forfeiture action in U.S. District Court.

96. After several telephonic inquiries, on January 26, 2010, counsel for ACCG wrote Customs to indicate that if a forfeiture action was not filed within two-week's time, ACCG would likely seek relief in Court.

97. Based upon a review of the Court's "PACER" system, as of the date for filing this Complaint, the United States has not filed a forfeiture action against the collectors' coins, which would allow ACCG to contest their seizure in Court.

**FIRST CAUSE OF ACTION**
**Unlawfully Withheld or Unreasonably Delayed Agency Action- APA, 5 U.S.C. §7706 (1)**

98. Plaintiff repeats and realleges as if fully set forth herein the allegations contained in paragraph numbers 1 through 97.

99. Under the APA, 5 U.S.C. § 706 (1), a "reviewing court shall…compel agency action unlawfully withheld or unreasonably delayed…"

100. Under CAFRA, 18 U.S.C. § 983 (a) (3) (A), "[n]ot later than 90 days after a claim has been filed, the Government shall file a complaint for forfeiture in the manner set forth in the Supplemental Rules for Certain Admiralty and Maritime Claims or return the property pending the filing of a complaint…."

101. More than ninety (90) days have elapsed since ACCG has submitted its seized asset claim, but upon information and belief, no proceedings relating to the collectors' coins have been instituted in any court.

102. By failing to file a forfeiture complaint within ninety (90) days of Plaintiff ACCG's submission of a seized asset claim, Defendants have unlawfully withheld and unreasonably

delayed agency action required under CAFRA, in violation of and as actionable under APA, 5 U.S.C. § 706 (1),

103.    As a result of Defendants' unlawful withholding and unreasonable delay of agency action, Plaintiff ACCG has been adversely affected and aggrieved.

104.    By reason of the foregoing, Defendants should be compelled to return the collectors' coins.

105.    Alternatively, by reason of the foregoing, Defendants should be compelled to cause a prompt commencement of a proceeding for forfeiture of the collectors' coins in which the validity of import restrictions on Cypriot and Chinese coins as set forth more fully below can be tested in court.

## SECOND CAUSE OF ACTION
### Agency Action Failing to Meet Statutory, Procedural, and Constitutional Requirements— Administrative Procedure Act, 5 U.S.C. § 706 (2) (B), (C), and (D)

106.    Plaintiff repeats and realleges as if fully set forth herein the allegations contained in paragraph numbers 1 through 105.

107.    Under the APA, 5 U.S.C. § 706 (2), a "reviewing court shall…hold unlawful and set aside agency action, findings, and conclusions found to be …(B) contrary to constitutional right…; (C) in excess of statutory …limitations, or short of statutory right; [or] (D) without observance of procedure required by law…."

108.    By seizing and confiscating the collectors' coins without filing a complaint for forfeiture within ninety (90) days of submission of the ACCG's seized asset claim, Defendants have acted contrary to the provisions of CAFRA as well as contrary to ACCG's rights under the Fifth Amendment, each of which is actionable under the APA, 5 U.S.C. § 706 (2).

109.    By reason of the foregoing, Defendants should be compelled to return the collectors'
coins.

110.    Alternatively, Defendants should be compelled to cause a prompt commencement of a
proceeding for forfeiture of the collectors' coins in which the validity of import restrictions
on Cypriot and Chinese coins can be tested in court as set forth more fully below.

### THIRD CAUSE OF ACTION
### Declaratory Relief – CAFRA, 18 U.S.C. § 983

111.    Plaintiff repeats and realleges as if fully set forth herein the allegations contained in
paragraph numbers 1 through 110.

112.    Congress, via the enactment of the CAFRA, has directed that all executive departments
and administrative agencies of the United States afford certain procedural safeguards in
connection with the confiscation of property.

113.    Congress' purpose in enacting CAFRA was to prevent the government from retaining
property allegedly subject to forfeiture without commencing a judicial proceeding wherein
private claimants of such property could be assured their day in court.

114.    Toward that end, Congress expressly provided under CAFRA, 18 U.S.C. § 983 (a)(3) the
twin remedies for the redress of delays caused by the government's failure to institute timely
forfeiture proceedings; prompt release of the property alleged to be subject to forfeiture and
permanent enjoinment of future action to confiscate the property on the basis of the same
alleged offense.

115.    As a property owner that has been denied prompt opportunity to contest a government
seizure, Plaintiff ACCG is among the entities for whose specific benefit Congress enacted
CAFRA and provided judicially enforceable remedies for undue government delay.

116.   By reason of the foregoing, and pursuant to 28 U.S.C. § 2201, Plaintiff ACCG is entitled, under 18 U.S.C. § 983, to bring suit against Defendants for declaratory relief to compel defendants to discharge their statutory obligations under CAFRA.

117.   By reason of the foregoing, Defendants should be compelled to return the collectors' coins and be enjoined from any future action to seize them.

118.   Alternatively, Defendants should be compelled to cause a prompt commencement of a proceeding for forfeiture of the collectors' coins in which the validity of import restrictions on Cypriot and Chinese coins can be tested in court as set forth more fully below.

### FOURTH CAUSE OF ACTION
### Due Process of Law—Fifth Amendment

119.   Plaintiff repeats and realleges as if fully set forth herein the allegations contained in paragraph numbers 1 through 118.

120.   By seizing the collectors' coins without filing a forfeiture action, Defendants have deprived Plaintiff ACCG of its property without due process of law, in violation of the Fifth Amendment of the United States Constitution.

121.   By virtue of its inherent equitable powers to remedy constitutional violations, and pursuant to 28 U.S.C. § 2201, this Court is possessed of authority and power to declare the seizure of the collectors' coins to be an unlawful violation of the Fifth Amendment of the U.S. Constitution, and to compel Defendants to return the collectors' coins to Plaintiff ACCG.

122.   Alternatively, Defendants should be compelled to cause a prompt commencement of a proceeding for forfeiture of the collectors' coins in which the validity of import restrictions on Cypriot and Chinese coins can be tested in court as set forth more fully below.

## FIFTH CAUSE OF ACTION
### Relief in the Nature of Mandamus—Mandamus and Venue Act

123.    Plaintiff repeats and realleges as if fully set forth herein the allegations contained in paragraph numbers 1 through 122.

124.    At all relevant times, officials at Defendants have a nondiscretionary duty to cause the prompt commencement of a proceeding for the forfeiture of the collectors' coins.

125.    More than ninety (90) days have elapsed since Plaintiff ACCG submitted a seized assets claim asserting ownership of the collectors' coins and requesting that the matter be referred to court for the institution of a forfeiture action.

126.    Upon information and belief, officials at Defendants have failed to cause the commencement of any proceeding for forfeiture of the collectors' coins.

127.    By reason of the foregoing, this Court is possessed of authority and power, pursuant to 28 U.S.C. § 1361, to grant Plaintiff ACCG relief in the nature of mandamus, compelling Defendants to return the collectors' coins to Plaintiff ACCG.

128.    Alternatively, Defendants should be compelled to cause a prompt commencement of a proceeding for forfeiture of the collectors' coins in which the validity of import restrictions on Cypriot and Chinese coins can be tested in court as set forth more fully below.

## SIXTH CAUSE OF ACTION
### Relief Under APA- Declaration that Cypriot Import Restrictions on Coins are Arbitrary and Capricious, an Abuse of Discretion or Without Observance of Procedure Required By Law

129.    Plaintiff repeats and realleges as if fully set forth herein the allegations contained in paragraph numbers 1 through 128.

130.    Under the APA, 5 U.S.C. § 702, ACCG is entitled to review of Defendants State's and Assistant Secretary, ECA's actions.

131.    Pursuant to the APA, 5 U.S.C. § 706 (2)(A), (D),  a Federal district court may hold unlawful and set aside an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law."

132.    The United States Supreme Court has set aside as "arbitrary and capricious" an agency action in circumstances where the agency failed to provide a reasoned explanation for its departure from prior agency precedent.  *See, e.g., Massachusetts v. EPA*, 549 U.S. 497, 533-35 (2007) (Supreme Court ruled agency's decision to be arbitrary and capricious because the agency failed to offer any reasoned explanation for its refusal to decide whether greenhouse gases caused or contributed to climate change); *Motor Vehicle Mfrs. Ass'n  v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 34 (1983) (agency's rescinding of rule requiring passive restraints in automobiles was arbitrary and capricious for failure to provide a reasoned explanation justifying the revocation)**.**

133.    Prior to State's decision to impose import restrictions on coins of Cypriot type, State had exempted such coins from import restrictions.

134.    Moreover, under CPIA, 19 U.S.C. §  2602 (g)(2), once State enters into an MOU with a State Party to the 1970 UNESCO Convention imposing import restrictions on cultural artifacts, State is required to report to Congress.  That report must: (a) describe the actions taken; (b) indicate whether there were any differences between those actions and CPAC's recommendations; and (c) state, if so, the reasons for those differences.

135.    On August 29, 2007, State sent the mandated report concerning the Cyprus MOU and import restrictions on cultural artifacts to Congress pursuant CPIA, 19 U.S.C. § 2602 (g)(2).

136.    That Report contains no indication whether State rejected CPAC recommendation against import restrictions on coins, and, if so, why?

137.    Subsequently, in a signed declaration, CPAC's chairman at the time the Cypriot restrictions were decided, reviewed this report and then stated, "*I believe it is absolutely false to suggest in those materials that the State Department's decision to extend import restrictions to ancient coins was consistent with CPAC's recommendations.*"   (emphasis added).

138.    By reason of the foregoing, the Court should declare that State's failure to provide a rational explanation under the CPIA for its departure from prior agency practice exempting coins of Cypriot type from restriction mandates that State's decision be held unlawful and set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law."

139.    Moreover, by reason of State's failure under the CPIA to report to Congress about this departure from both prior agency practice and the recommendations of its own advisory committee, the Court should also declare that State's actions are unlawful and should be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law."

140.    Alternatively, Defendants should be compelled to cause a prompt commencement of a proceeding for forfeiture of the collectors' coins in which the validity of State's decision to impose import restrictions on coins of Cypriot type can be tested in Court as to whether it

should be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law."

### SEVENTH CAUSE OF ACTION
**Relief Under APA- Declaration that Cypriot and Chinese Import Restrictions on Coins are Arbitrary and Capricious, an Abuse of Discretion, Contrary to Law or Without Observance of Procedure Required By Law**

141.   Plaintiff repeats and realleges as if fully set forth herein the allegations contained in paragraph numbers 1 through 140.

142.   Under the APA, 5 U.S.C. § 702, ACCG is entitled to review of Defendants State's and Assistant Secretary, ECA's actions.

143.   Pursuant to the APA, 5 U.S.C. § 706 (2)(A), (D),   a Federal district court may hold unlawful and set aside an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law."

144.   As set forth more fully above in the Statement of Facts, the decisions to impose import restrictions on coins of Cypriot and Chinese type are the products of bias, and/or prejudgment and/or *ex parte* contact.   Upon information and belief, these deficiencies include, *inter alia,* the following actions:

a. Adding coins to the designated list of artifacts subject to restriction in response to China's request for import restrictions without a request from China to do so;

b. Engaging in behind the scenes contacts with CAARI about extending import restrictions to coins of Cypriot type even before Cyprus requested them to be added to the designated list;

c. Directly or indirectly funding CAARI, a proponent of extending import restrictions to coins of Cypriot type;

d.  Refusing to recuse an archaeologist who is dependent on a license from the Cypriot Department of Antiquities in order to continue to excavate on the Island from voting on CPAC's recommendations with regard to import restrictions on coins of Cypriot type;

e.  Failing to provide proper public notice for the effort to extend import restrictions on coins of Cypriot type:

f.  Confusing "cultural significance" with "archaeological significance" when it comes to objects that exist in many multiples, like coins;

g.  Ignoring evidence that Cypriot and Chinese coins circulated widely beyond the places of their manufacture and instructing Customs that its officers could assume that Cypriot and Chinese coins were first found in the ground of these countries for purposes of imposing import restrictions;

h. Ignoring the CPIA's requirements that less drastic measures be contemplated before imposing import restrictions;

i.  Ignoring the CPIA's "concerted international response" requirement;

j. Providing past Assistant Secretary, ECA Dina Powell with the false choice of either approving import restrictions adding coins in their entirety or disapproving them in their entirety;

k.  Allowing past Assistant Secretary, ECA Dina Powell to extend the MOU with Cyprus and add restrictions on coins of Cypriot type after she had already announced her departure from ECA to an entity that likely has business relationships with either Cyprus or Cypriot entities;

l.  Allowing Undersecretary of State Nicholas Burns to influence the decision to impose import restrictions on coins of Cypriot type, though he had just received an award from Greek and Greek Cypriot interests and had displayed bias in favor of such interests;

m.  Inviting proponents of import restrictions on coins to the signing ceremony for the Cypriot MOU, and stage managing the Cypriot Ambassador's statements disparaging coin collectors at that ceremony;

n.  Misleading the public in a press release about the MOU about CPAC's recommendations on coins;

o.  Misleading Congress about CPAC's recommendations about coins in an official report mandated under the CPIA.

145.  By reason of the foregoing, the Court should declare that State's decisions to impose import restrictions on coins of Cypriot or Chinese type should be held unlawful and set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law."

146.  Alternatively, Defendants should be compelled to cause a prompt commencement of a proceeding for forfeiture of the collectors' coins in which the validity of State's decision to impose import restrictions on coins of Cypriot type can be tested in Court as to whether it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law."

**EIGHTH CAUSE OF ACTION**
**Relief Under APA- Declaration that Customs Has the Burden of Proof to Trace Coins Back to Their Find Spots**

147.  Plaintiff repeats and realleges as if fully set forth herein the allegations contained in paragraph numbers 1 through 146.

148.   Under the APA, 5 U.S.C. § 706 (2), a "reviewing court shall…hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; … (C) in excess of statutory …limitations, or short of statutory right; [or] (D) without observance of procedure required by law…."

149.   Under CAFRA, Customs —not the claimant—is now required to prove by a preponderance of non-hearsay evidence that the property is subject to forfeiture.  18 U.S.C. § 983 (c) (1).

150.   Moreover, under the CPIA, Customs must ensure that any designated list of material subject to restriction shall be sufficiently specific and precise to ensure that the material is *only applied* to the material covered by any agreement to impose import restrictions. CPIA, 19 U.S.C. § 2604 (1). (Emphasis added.)

151.   By designating as restricted "coins of Cypriot type" and Chinese coins from the Tang and pre-Tang periods as subject to import controls, Defendants have violated the CPIA's provisions that restrictions shall only be applied to artifacts that the restricted artifacts were "first discovered within" the State Party  seeking restrictions. CPIA, 19 U.S.C. § 2601 (2) (C).

152.   By seizing the collectors' coins based on the mere fact they are Cypriot or Chinese coins, Defendants have also violated the CAFRA's mandate assigning the government the burden of proof in all seizures.   CPIA, 19 U.S.C. § 2601 (2) (C).

153.   To the extent Defendants rely on the assumption to meet this burden that Cypriot and Chinese coins must have been first discovered in those countries, any such assumption is demonstrably false.

154.   By reason of the foregoing, the Court should declare that Defendants' practice  to seize coins based on their type alone is unlawful and set it aside as "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;… (C) in excess of statutory …limitations, or short of statutory right; [or] (D) without observance of procedure required by law…."

155.   Alternatively, Defendants should be compelled to cause a prompt commencement of a proceeding for forfeiture of the collectors' coins in which the validity of State's and Custom's practice to seize coins based on their type alone can be tested in Court as to whether it is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (C) in excess of statutory …limitations, or short of statutory right"; or (D) without observance of procedure required by law…."

WHEREFORE, Plaintiff respectfully requests that judgment be granted as follows:

   a.   Declaring as follows:

      i.   That Defendants have violated CAFRA in seizing and confiscating the collectors' coins;

      ii.   That Defendants have deprived Plaintiff of property without due process of law, in violation of the Fifth Amendment;

      iii.   That the decision to impose import restrictions on ancient coins of Cypriot type is arbitrary and capricious because, pursuant to applicable law, Defendant State failed to disclose the reason, or reasons, to Congress behind State's  decision making processes in rejecting the advice of its own advisory committee and also in departing from prior agency practice;

        iv.      That the decisions to impose import restrictions on ancient coins of both Cypriot and Chinese type are also arbitrary and capricious because they are they are both contrary to law and the product of bias, prejudgment and *ex parte* contact; and

        v.      That under the CPIA and CAFRA Customs and State must prove that Cypriot or Chinese coins were illicitly removed from Cypriot or Chinese find spots before they may be forfeited.

b.      Compelling Defendants Commissioner of Customs and Assistant Secretary, ECA to suspend import restrictions on ancient coins of Cypriot type and Tang period and pre-Tang period Chinese coins;

c.      Compelling Defendant Commissioner of Customs to ensure that coins be traced back to their find spots before they may be forfeited under CPIA and CAFRA;

d.      Compelling Defendants to return the collectors' coins to ACCG and enjoin Defendants from seizing them in the future;

e.      Or, alternatively compelling Defendants to cause a prompt commencement of a proceeding for forfeiture of the collectors' coins in which the validity of State's and Custom's decision to impose import restrictions on coins of Cypriot and Chinese type and practice  to seize coins based on their type alone can be tested in Court as to whether they are "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law…; (C) in excess of statutory …limitations, or short of statutory right"; [or] (D) without observance of procedure required by law…."

f.      Awarding reasonable attorneys' fees and costs in favor of Plaintiff ACCG; and

g.      Ordering such other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff respectfully demands a jury trial in this action.


Dated: Feb. 11, 2010                              Respectfully submitted,

                                                  *//s// Jason H. Ehrenberg*
                                                  _____
                                                  Jason H. Ehrenberg (#16481)
                                                  Peter K. Tompa[*]
                                                  BAILEY & EHRENBERG PLLC
                                                  1015 18th Street N.W.
                                                  Suite 601
                                                  Washington, D.C. 20036
                                                  Tel:  (202) 331-4150
                                                  Fax:  (202) 318-7071
                                                  jhe@becounsel.com

                                                  **Attorneys for Plaintiff**

---

[*] Admission *pro hac vice* to be submitted.