**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|                                                                                      |     |                              |
| ------------------------------------------------------------------------------------ | --- | ---------------------------- |
| ANCIENT COIN COLLECTORS GUILD                                                        | :   |                              |
|                                                                                      | :   |                              |
| v.                                                                                   | :   |                              |
|                                                                                      | :   | Civil Action No. CCB-10-322  |
| U.S. CUSTOMS AND BORDER                                                               | :   |                              |
| PROTECTION, DEPARTMENT OF                                                             | :   |                              |
| HOMELAND SECURITY, *et al.*                                                           | :   |                              |
|                                                                                      | :   |                              |

...o0o...

## MEMORANDUM

This action arises out of the seizure of twenty-three ancient Cypriot and Chinese coins that the Ancient Coin Collectors Guild ("ACCG") purchased from a coin dealer in London and imported to the United States. Following the seizure, ACCG filed this action "to test the legality" of import restrictions imposed on certain ancient Cypriot and Chinese coins. ACCG sued the U.S. Customs and Border Protection ("Customs"), the Commissioner of Customs and Border Protection ("Commissioner of Customs" or "Commissioner"), the U.S. Department of State ("State"), and the Assistant Secretary of State for Educational and Cultural Affairs ("Assistant Secretary for ECA") (collectively, "the defendants" or "the government"), alleging violations of the Administrative Procedure Act ("APA"), the International Emergency Economic Powers Act ("IEEPA"), the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), and the First and Fifth Amendments to the U.S. Constitution. ACCG also alleges that the defendant acted "*ultra vires*," and seeks relief in the form of a declaratory judgment, an injunction, and a writ of mandamus. Pending before this court is a motion to dismiss or, in the alternative, for summary judgment, filed by the defendants. For the reasons discussed below, the government's motion will be granted.

# Table of Contents

I.   Background ................................................................................................................ 2

    A.   The Cultural Property Convention and the CPIA ....................................... 2
    B.   The import restrictions on Cypriot coins ................................................... 9
    C.   The import restrictions on Chinese coins ................................................ 11
    D.   The importation and seizure of ACCG's coins ....................................... 12
    E.   ACCG's concurrent FOIA action ........................................................... 14
    F.   This lawsuit ............................................................................................. 15

II.  Subject Matter Jurisdiction .................................................................................. 16

III. Standard of Review ............................................................................................... 20

IV.  ACCG's challenge to the import restrictions ....................................................... 21

    A.   Judicial Review of State Department Actions ......................................... 23
        1.   APA Review ..................................................................................... 23
        2.   *Ultra vires* review ........................................................................... 29
            i.    The "first discovered" requirement ........................................ 31
            ii.   Chinese request for import restrictions ................................. 36
            iii.  ACCG's other ultra vires claims ........................................... 38
        3.   Constitutional review ....................................................................... 39

    B.   Judicial Review of Customs Actions ...................................................... 42
        1.   APA Review ..................................................................................... 43
        2.   *Ultra vires* review ........................................................................... 44
        3.   Constitutional review ....................................................................... 45
            i.    Delay in filing forfeiture action ............................................ 45
            ii.   "Watch list" claim ................................................................. 48
        4.   CAFRA .............................................................................................. 50
        5.   Mandamus ........................................................................................ 51

V.   Conclusion ........................................................................................................... 52

## I.   BACKGROUND

## A.   The Cultural Property Convention and the CPIA

In 1970, the United States became a signatory to the Convention on the Means of

Prohibiting and Preventing the Illicit Import, Export, and Transfer of Ownership of Cultural

Property (the "Cultural Property Convention" or "Convention"), November 14, 1970, 823

U.N.T.S. 231.  Article 9 of the Convention provides:

> Any State Party to this Convention whose cultural patrimony is in jeopardy from pillage
> of archaeological or ethnological materials may call upon other States Parties who are

affected.  The States Parties to this Convention undertake, in these circumstances, to participate in a concerted international effort to determine and to carry out the necessary concrete measures, including the control of exports and imports and international commerce in the specific materials concerned.  Pending agreement each State concerned shall take provisional measures to the extent feasible to prevent irremediable injury to the cultural heritage of the requesting State.

The Senate gave its unanimous advice and consent to the Convention in 1972, subject to one reservation and six understandings.  *See* 118 Cong. Rec. 27,924-25 (1972) (ratifying the Convention but reserving the right "to determine whether or not to impose export controls over cultural property").  As a non-self-executing treaty, the Convention required implementing legislation before it became enforceable U.S. law.  Congress enacted such legislation through the Convention on Cultural Property Implementation Act (CPIA) in 1983.  Pub. L. 97–446, Title III 96 Stat. 2350 (1983) (codified at 19 U.S.C. § 2601 *et seq*.).

The CPIA, among other things, defined the term "archaeological or ethnological materials," which the Convention left undefined, thereby specifying which types of material may be subject to U.S. import restrictions:

The term "archaeological or ethnological material of the State Party" means—,
(A)    any object of archaeological interest;
(B)    any object of ethnological interest; or
(C)    any fragment or part of any object referred to in subparagraph (A) or (B);
which was first discovered within, and is subject to export control by, the State Party.

19 U.S.C. § 2601(2).  The regulations at issue here treat ancient coins as objects "of archaeological interest," and ACCG does not dispute this characterization.  Accordingly, an ancient coin or category of coins may be subject to an import restriction only if it "(I) is of cultural significance; (II) is at least two hundred and fifty years old; and (III) was normally discovered as a result of scientific excavation, clandestine or accidental digging, or exploration on land or under water."  *Id.* § 2601(2)(i).

The CPIA also established a mechanism through which the U.S. would comply with its obligations under Article 9 of the Convention. That mechanism is triggered when a state party to the Convention requests that the U.S. impose measures under Article 9 to protect the requesting country's "cultural patrimony." 19 U.S.C. § 2602(a)(1). Upon receiving such a request, the President must (1) publish notification of the request in the Federal Register and (2) submit to the Cultural Property Advisory Committee (CPAC) "such information . . . as is appropriate to enable the Committee to carry out its duties." *Id.* § 2602(f)(1)-(2). The CPAC, which was established by the CPIA, is a committee of eleven individuals, including two persons "representing the interests of museums," three "experts in the fields of archaeology, anthropology, ethnology, or related areas," three "experts in the international sale of archaeological, ethnological, and other cultural property," and three persons who "represent the interest of the general public." *Id.* § 2605(a)-(b). The CPAC must "undertake an investigation" and prepare a report setting forth

(A) the results of such investigation and review;
(B) its findings as to the nations individually having a significant import trade in the relevant material; and
(C) its recommendation, together with the reasons therefor, as to whether an agreement should be entered into under section 303(a) with respect to the State Party.

*Id.* § 2605(f)(1). If the CPAC recommends that the President enter into an agreement to implement Article 9 (an "Article 9 agreement"), its report must also set forth

(A) such terms and conditions which it considers necessary and appropriate to include within such agreement, or apply with respect to such implementation, for purposes of carrying out the intent of the Convention; and
(B) such archaeological or ethnological material of the State Party, specified by type or such other classification as the Committee deems appropriate, which should be covered by such agreement or action.

*Id.* § 2605(f)(4). The CPAC must then submit its report to the President and to Congress. *Id.* §§ 2605(f)(6); 2602(f)(3)(B).

Upon receiving the CPAC report, the President "determines" whether the requirements of 19 U.S.C. § 2602(a)(1) have been met. Those requirements are the following:

(A)  that the cultural patrimony of the State Party is in jeopardy from the pillage of archaeological or ethnological materials of the State Party;

(B)  that the State Party has taken measures consistent with the Convention to protect its cultural patrimony;

(C)  that—,
  (i)  the application of the import restrictions set forth in section 307 [19 U.S.C. § 2606] with respect to archaeological or ethnological material of the State Party, if applied in concert with similar restrictions implemented, or to be implemented within a reasonable period of time, by those nations (whether or not State Parties) individually having a significant import trade in such material, would be of substantial benefit in deterring a serious situation of pillage, and
  (ii)  remedies less drastic than the application of the restrictions set forth in such section are not available; and

(D)  that the application of the import restrictions . . . is consistent with the general interest of the international community in the interchange of cultural property among nations for scientific, cultural, and educational purposes . . .

Id. § 2602(a)(1). In making those determinations, the President must "consider . . . [the CPAC's] views and recommendations." Id. § 2602(f)(3). The President must then also determine whether other countries with a "significant import trade" in the affected materials would apply import restrictions "in concert" with the United States (or that such restrictions "are not essential to deter a serious situation of pillage"). Id. § 2602(c). If these requirements have been met, then the President may enter into an Article 9 agreement with the requesting state party. Id. § 2602(a)(2). The Article 9 agreement must designate which "archaeological or ethnological material" will be protected by import restrictions. Id. §§ 2601(7); 2602(a)(2). In negotiating the agreement, the President must "[e]ndeavor to obtain the commitment" of the requesting state party to permit the exchange of archaeological and ethnological materials "under circumstances in which such exchange does not jeopardize its cultural patrimony." Id. § 2602(a)(4).

After the agreement enters into force, the CPIA requires that the Secretary of the Treasury, in consultation with the Director of the United States Information Agency, "promulgate (and when appropriate shall revise) a list of the archaeological or ethnological material of the State Party covered by the agreement." *Id.* § 2604. Each listing must be "sufficiently specific and precise to insure that (1) the import restrictions under section 307 are applied only to the archaeological and ethnological material covered by the agreement or emergency action; and (2) fair notice is given to importers and other persons as to what material is subject to such restrictions." *Id.*; *see also id.* § 2601(7)(B) (providing that materials are not "designated archaeological or ethnological material"—and thus cannot be subject to import restrictions, *see id.* § 2606(a)—until they are "listed by regulation under [§ 2604]").

Once the Secretary of the Treasury promulgates a list of the designated materials, then the materials may not be imported into the United States unless "the State Party issues a certification or other documentation which certifies that such exportation was not in violation of the laws of the State Party," *id.* § 2606(a), or if the importer provides "satisfactory evidence that such material was exported from the State Party"

    (A)    not less than ten years before the date of such entry and that neither the person for whose account the material is imported (or any related person) contracted for or acquired an interest, directly or indirectly, in such material more than one year before that date of entry, or

    (B)    on or before the date on which such material was designated under section 305.

*Id.* § 2606(b). If Customs discovers materials being imported in violation of CPIA import restrictions, it "shall refuse to release the material . . . until such documentation or evidence is filed." *Id.* "If such documentation or evidence is not presented within ninety days after the date on which such material is refused release from customs custody, or such longer period as may be

allowed by the Secretary for good cause shown, the material shall be subject to seizure and forfeiture." *Id*.

In addition, the CPIA authorizes the President, without negotiating an Article 9 agreement, to impose temporary import restrictions if the President determines that any of the following "emergency condition[s]" applies:

(1) a newly discovered type of material which is of importance for the understanding of the history of mankind and is in jeopardy from pillage, dismantling, dispersal, or fragmentation;

(2) identifiable as coming from any site recognized to be of high cultural significance if such site is in jeopardy from pillage, dismantling, dispersal, or fragmentation which is, or threatens to be, of crisis proportions; or

(3) a part of the remains of a particular culture or civilization, the record of which is in jeopardy from pillage, dismantling, dispersal, or fragmentation which is, or threatens to be, of crisis proportions,

19 U.S.C. § 2603(a), and if the implementation of import restrictions "on a temporary basis would, in whole or in part, reduce the incentive for such pillage, dismantling, dispersal or fragmentation." *Id.* As with non-emergency restrictions, the President must "consider the views and recommendations" of the CPAC in deciding whether to impose emergency import restrictions. *Id.* § 2603(c)(2). Emergency restrictions imposed under § 2603 may not be applied for more than five years, though the President may extend the period for an additional three years "if the President determines [after consulting with the CPAC] that the emergency condition continues to apply." *Id.* § 2603(c)(3).

Finally, the CPIA imposes an additional reporting requirement on the President. Upon entering an Article 9 agreement or imposing emergency import restrictions, the President must submit a report to Congress with a description of the action, differences (if any) between such action and the recommendations of the CPAC, and the reasons for those differences. *Id.* § 2602(g).

After Congress enacted the CPIA, President Reagan delegated his responsibilities under the statute to three officials: the Secretary of State, the Secretary of the Treasury, and the Director of the United States Information Agency (USIA). *See* Exec. Order No. 12,555, 51 Fed. Reg. 8475 (Mar. 10, 1986). The Secretary of State was responsible for negotiating Article 9 agreements and developing reports for Congress; the Secretary of the Treasury was responsible for imposing emergency import restrictions and suspending non-emergency import restrictions; the Director of the USIA was responsible for deciding whether to enter, extend and/or suspend Article 9 agreements or impose emergency import restrictions, as well as making the factual determinations underlying those decisions, publishing notice of Article 9 requests, submitting information to the CPAC and receiving its reports, and deciding whether particular CPAC proceedings should be publicized. *Id.* The President did not reserve any authority over imposition of import restrictions under the CPIA. *See id.*; *cf. Sisseton-Wahpeton Oyate v. U.S. Dept. of State*, 659 F. Supp. 2d 1071, 1082 (D.S.D. 2009) (describing Executive Order 13337, 69 Fed. Reg. 25,299 (April 30, 2004), which reserved with the President the authority to determine whether to issue a presidential permit for a cross-border oil pipeline in the event any of certain designated officials were to disagree with the initial determination made by the Secretary of State). In 1998, § 1312(a) of the Foreign Affairs Agencies Consolidation Act of 1998 transferred all functions of the Director of the USIA to the Secretary of State. Pub. L. 105-277, Div. G, Subdiv. A (codified at 22 U.S.C. § 6532). In 1999, Secretary of State Albright delegated her authority under Executive Order 12,555 to the Under Secretary of State for Public Diplomacy and Public Affairs. *See* Department of State Delegation of Authority No. 234, 64 Fed. Reg. 56,014 (Oct. 15, 1999), §1(a)(6). In 2000, the Under Secretary delegated that authority, including the authority to make the necessary threshold determinations under 19 U.S.C. §§ 2602

and 2603, to the Assistant Secretary for ECA.  Department of State Delegation of Authority No. 236-3, 65 Fed. Reg. 53,795 (Aug. 28, 2000).  In 2003, the President withdrew the CPIA authority that had been delegated to the Secretary of the Treasury, and transferred that authority to the Secretary of Homeland Security.  Exec. Order No. 13,296 § 44, 68 Fed. Reg. 10,618, 10,627 (Mar. 5, 2003).  The authority of the Secretary of Homeland Security under the CPIA is delegated to Customs and Border Protection.  Thus, as of March 2003, the President's authority under the CPIA was held by the Secretary of Homeland Security and the Assistant Secretary for ECA.

The CPIA entrusts to the Secretary of the Treasury the authority to determine how import restrictions will be enforced once an archaeological or ethnological item appears on a designated list.  19 U.S.C. § 2612.  The regulations governing the enforcement of import restrictions are codified at 19 C.F.R. §§ 12.104-12.104j, and are enforced by "appropriate customs officers."  *Id.* § 12.104i.  The regulations flesh out the enforcement scheme mandated by the CPIA, such as by explaining the required form that a certificate from a state party must take.  *See id.* § 12.104c(a).

**B.     The import restrictions on Cypriot coins**

On September 4, 1998, the USIA received a request from Cyprus that the U.S. impose import restrictions on certain Byzantine ethnological material from Cyprus.  *See* Notice of Receipt of Cultural Property Request From the Government of the Republic of Cyprus, 63 Fed. Reg. 49,154 (Sept. 14, 1998).  Pursuant to the emergency provisions of the CPIA, the U.S. Customs Service imposed emergency import restrictions on "[e]cclesiastical and ritual ethnological material from Cyprus representing the Byzantine period dating from approximately the 4th century A.D. through the 15th century A.D."  Import Restrictions Imposed On Byzantine Ecclesiastical and Ritual Ethnological Material from Cyprus, 64 Fed. Reg. 17,529, 17,530 (April

12, 1999).  In 2002, following bilateral negotiations between the United States and Cyprus, the two countries entered into a Memorandum of Understanding pursuant to Article 9 of the Cultural Property Convention ("2002 Cyprus MOU").  *See* Import Restrictions Imposed On Pre-Classical and Classical Archaeological Material Originating in Cyprus, 67 Fed. Reg. 47,447 (July 19, 2002).  In 2003, the President extended the emergency import restrictions that had originally been imposed in 1999.  *See* Extension of Emergency Import Restrictions Imposed on Ethnological Material from Cyprus, 68 Fed. Reg. 51,903 (Aug. 29, 2003).  In August 2006, the U.S. and Cyprus amended the 2002 MOU to include the materials protected by the emergency restrictions.  *See* Import Restrictions on Byzantine Ecclesiastical and Ritual Ethnological Material from Cyprus, 71 Fed. Reg. 51,724 (Aug. 31, 2006).  None of these Cypriot import restrictions applied to coins.

In December 2006, the State Department announced that Cyprus had requested an extension of the 2002 MOU.  *See* Notice of Proposal, 71 Fed. Reg. 71,015 (Dec. 7, 2006).[1]  On May 30, 2007, the Assistant Secretary for ECA agreed to extend the import restrictions.  *See* Extension of Import Restrictions, 72 Fed. Reg. 38,470, 38,471 (July 13, 2007).[2]  On July 6, 2007, through an exchange of diplomatic notes, the United States and Cyprus amended and extended the agreement to impose restrictions on all cultural property encompassed in the amended MOU for an additional five years.  *Id*.; *see also* Diplomatic Note from the U.S. Department of State to the Embassy of Cyprus in Washington, D.C., July 3, 2007 (Pl.'s Ex. A, Ex. 2); Diplomatic Note from the Embassy of Cyprus in Washington, D.C., to the U.S. Department of State, July 6, 2007

---

[1] In full, the notice was entitled "Notice of Proposal to Extend the Memorandum of Understanding Between the Government of the United States of America and the Government of the Republic of Cyprus Concerning the Imposition of Import Restrictions on Pre-Classical and Classical Archaeological Objects and Byzantine Period Ecclesiastical and Ritual Ethnological Materials."

[2] In full, the final rule was entitled "Extension of Import Restrictions Imposed on Pre-Classical and Classical Archaeological Objects and Byzantine Period Ecclesiastical and Ritual Ethnological Material From Cyprus."

(Pl.'s Ex. A, Ex. 2). Customs and Border Protection then promulgated an amended Designated

List of restricted archaeological and ethnological materials. 72 Fed. Reg. at 38,471-73. The list

included the following:

> D. Coins of Cypriot Types
> Coins of Cypriot types made of gold, silver, and bronze including but not limited to:
> 1. Issues of the ancient kingdoms of Amathus, Kition, Kourion, Idalion, Lapethos, Marion, Paphos, Soli, and Salamis dating from the end of the 6th century B.C. to 332 B.C.
> 2. Issues of the Hellenistic period, such as those of Paphos, Salamis, and Kition from 332 B.C. to c. 30 B.C.
> 3. Provincial and local issues of the Roman period from c. 30 B.C. to 235 A.D. Often these have a bust or head on one side and the image of a temple (the Temple of Aphrodite at Palaipaphos) or statue (statue of Zeus Salaminios) on the other.

*Id.* at 38,473. The restriction on the importation of designated Cypriot coins went into effect on

July 16, 2007. *Id.* at 38,470.

**C.      The import restrictions on Chinese coins**

On May 27, 2004, the State Department received a request from China pursuant to

Article 9 of the Convention that the U.S. impose import restrictions on Chinese archaeological

material from the Paleolithic period to the Qing Dynasty. *See* Notice of Receipt of Cultural

Property Request from the Government of the People's Republic of China, 69 Fed. Reg. 53,970

(Sept. 3, 2004). In July 2005, according to the government, CPAC issued a report on the request,

recommending the imposition of import restrictions. (Defs.' Mem. at 16.). On May 13, 2008,

the Assistant Secretary for ECA determined that the requirements of 19 U.S.C. § 2602(a)(1) had

been met with respect to the Chinese request. *See* Import Restrictions Imposed on Certain

Archaeological Material from China, 74 Fed. Reg. 2,838, 2,839 (Jan. 16, 2009). On January 14,

2009, the United States and China entered an Article 9 agreement to restrict the importation of

certain archaeological materials from the Paleolithic period through the Tang dynasty. *Id.* On

January 16, 2009, DHS and Treasury published a Designated List, which included the following

types of bronze coins:

3. Coins.
   a. *Zhou Media of Exchange and Toolshaped Coins*: Early media of exchange include bronze spades, bronze knives, and cowrie shells. During the 6th century BC, flat, simplified, and standardized cast bronze versions of spades appear and these constitute China's first coins. Other coin shapes appear in bronze including knives and cowrie shells. These early coins may bear inscriptions.
   b. Later, tool-shaped coins began to be replaced by disc-shaped ones which are also cast in bronze and marked with inscriptions. These coins have a central round or square hole.
   c. *Qin*: In the reign of Qin Shi Huangdi (221–210 BC) the square-holed round coins become the norm. The new Qin coin is inscribed simply with its weight, expressed in two Chinese characters ban liang. These are written in small seal script and are placed symmetrically to the right and left of the central hole.
   d. *Han through Sui*: Inscriptions become longer, and may indicate that inscribed object is a coin, its value in relation to other coins, or its size. Later, the period of issue, name of the mint, and numerals representing dates may also appear on obverse or reverse.  A new script, clerical (lishu), comes into use in the Jin.
   e. *Tang*: The clerical script becomes the norm until 959, when coins with regular script (kaishu) also begin to be issued.

*Id.* at 2,842.  The restriction on the importation of designated Chinese coins went into effect on

January 16, 2009.  *Id.* at 2,839.

**D.  The importation and seizure of ACCG's coins**

In April 2009, ACCG purchased twenty-three ancient Chinese and Cypriot coins from

Spink, a coin dealer in London.  The invoice that accompanied the coins included a "[s]chedule

of contents." (Spink Invoice RT00052205, Defs.' Mem., Ex. 1, at 5.)[3]  The schedule indicated

that each coin was minted in Cyprus or China, that each coin had "[n]o recorded provenance,"

---

[3] When a court considers a motion to dismiss, it may consider documents not attached to the complaint, without converting a motion to dismiss into one for summary judgment, "if the document was integral to and explicitly relied on in the complaint and if the plaintiffs do not challenge its authenticity."  *CACI Int'l, Inc. v. St. Paul Fire and Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009).  Here, the parties have relied on documents attached to the amended complaint and various of their briefs.  The parties have not challenged the authenticity of any of them.  Accordingly, the court will consider the exhibits submitted by the parties in deciding the motion to dismiss.

and that for each, the "[f]ind spot" was "unknown." (*Id.*)[4]  On April 15, 2009, ACCG imported

the coins via a flight from London to Baltimore.  (*Id.* at 4.)  Customs detained the coins for

alleged violations of 19 U.S.C. § 2606 and 19 CFR § 12.104.  (*Id.* at 1-2.)  It issued a Notice of

Detention, which stated that its reason for detention was "[t]o allow for determination of import

eligibility and/or requirements."  (Notice of Detention, Defs.' Mem., Ex. 1, at 1.)  On May 13,

2009, counsel for ACCG wrote to Customs formally objecting to the detention of the coins.

(Letter from Peter Tompa to Eric Alexander, U.S. Customs and Border Protection (May 13,

2009), Defs.' Mem., Ex. 1, at 8.)

On May 15, 2009, Customs amended the Notice of Detention to specifically request that

ACCG present "[c]ertification or evidence in accordance with 19 CFR 12.104c."  (Notice of

Detention Amended, Defs.' Mem., Ex. 1, at 2.)  On May 27, 2009, ACCG disclaimed any ability

to present such evidence.  (Letter from Peter Tompa to Eric Alexander, U.S. Customs and Border

Protection (May 27, 2009), Defs.' Mem., Ex. 1, at 10 ("[A]s the coins—like the vast majority in

circulation in the collector market—have no known ownership history, ACCG cannot say if they

were first found in the ground of either China or Cyprus[.] . . .  Accordingly, no certification or

evidence under 19 CFR 12.104c is possible.").)  On July 20, 2009, Customs seized the coins, and

informed ACCG of the seizure on August 26, 2009.  (Letter from Paula Rigby, Fines, Penalties

& Forfeitures Officer, U.S. Customs and Border Protection, to Ancient Coin Collectors Guild

(Aug. 26, 2009), Defs.' Mem., Ex. 1, at 29-35.)  On September 8, 2009, counsel for ACCG wrote

to Customs to formally claim the coins, to assert its intention to contest the forfeiture of the coins

in the event Customs sought forfeiture, and to provide evidence of a customs bond to secure a

---

[4] The schedule listed a total of 23 items, valued at $275.  (Defs.' Mem., Ex. 1, at 5.)  An example of a Chinese coin
listed is "(1) China, Zhou Dynasty spade shaped coin ca. 400 BC.  Broken.  No recorded provenance.  Find spot
unknown.  FMV $10.00."  (*Id.*)  An example of a Cypriot coin listed is "(1) Cyprus AE 28mm.  Augustus, 27 BC -
AD 14.  Head of Augustus right / CA within laurel wreath.  No recorded provenance, Find spot unknown.  FMV
$58.00."  (*Id.*)

forfeiture action. (Letter from Peter Tompa to Paula Rigby (Sept. 8, 2009), Defs.' Mem., Ex. 1, at 45.)

In addition, ACCG alleges that on March 15, 2010, ACCG's Executive Director was searched by uniformed Customs officers on his return to the United States from England. (Am. Compl. ¶102.) According to ACCG, "ACCG's Executive Director reasonably believes he was placed on a 'watch list' due to ACCG's decision to import coins of Cypriot and Chinese type for purposes of this test case." (*Id.*)

**E.      ACCG's concurrent FOIA action**

Beginning in 2004, ACCG has sought access through FOIA to certain documents related to import restrictions on ancient coins from Cyprus, China and Italy. *See Ancient Coin Collectors Guild v. U.S. Dep't of State*, 673 F. Supp. 2d 1, 2 (D.D.C. 2009). Between July 30, 2004, and October 11, 2007, ACCG made eight FOIA requests. *Id.* In response to these requests, the government conducted multiple searches, which resulted in 128 responsive documents. *Id.* Of these documents, the government released 70 documents in full and 39 documents in part, and withheld 19 documents in full. *Id.* On November 15, 2007, ACCG sued in the U.S. District Court for the District of Columbia to compel the government to produce the withheld documents. On November 20, 2009, the district court granted the government's motion for summary judgment, holding that the documents ACCG sought were protected by one or more FOIA exemptions. *Id.* at 4-7.

On April 15, 2011, the D.C. Circuit largely upheld the district court's decision. *See Ancient Coin Collectors Guild v. U.S. Dept. of State*, 641 F.3d 504 (D.C. Cir. 2011). The court held that the State Department's withholding of documents under FOIA Exemptions 1 and 5 was proper, as was part of its withholding under Exemption 3. *Id.* at 509. The court reversed solely

with respect to the Department's withholding of one set of documents—a series of emails exchanged between a professor of archaeology and an employee of the Bureau of Education and Cultural Affairs. *See* 641 F.3d at 511.

The D.C. Circuit also held that § 2605(i)(1) qualifies as an Exemption 3 withholding statute. *Id.* That section prohibits disclosure of any information "submitted in confidence by the private sector to officers or employees of the United States or to the Committee in connection with the responsibilities of the Committee." 19 U.S.C. § 2605(i)(1). State relied solely on § 2605(i)(1) in withholding only one set of documents—a series of emails exchanged between a professor of archaeology and an employee of the Bureau of Education and Cultural Affairs. *See* 641 F.3d at 511. The court remanded to permit State to provide "additional reasons for its belief" that the professor's comments were made in confidence. *Id.*

The proceedings before the district court concerning the withholding of those emails are currently pending.

## F.     This lawsuit

On February 11, 2010, ACCG brought the instant lawsuit against Customs, the Commissioner of Customs, the State Department, and the Assistant Secretary of State. After the government filed a motion to dismiss or, in the alternative, for summary judgment, ACCG filed an amended complaint on July 15, 2010. In its ten-count amended complaint, ACCG alleges that the actions of both the State Department and Customs in connection with the import of Cypriot and Chinese type coins were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *see* 5 U.S.C. § 706(2)(A), violated the CPIA, IEEPA,[5] and the First

---

[5] In its amended complaint, ACCG alleges that the import restrictions violate the Berman Amendment of 1988, which amended IEEPA to exclude "informational materials" from the statute's requirements, and the Free Trade in Ideas Amendment, which reiterated that the Berman Amendment applied to all information, whether or not the information existed in tangible form at the time of a particular transaction. Omnibus Trade and Competitiveness Act

Amendment to the U.S. Constitution.  In addition, ACCG alleges that Customs violated its Fifth Amendment rights by seizing the coins without filing a forfeiture action, and violated its First Amendment rights by allegedly placing Spink and the Executive Director of ACCG on a "watch list."  (Am. Compl. ¶117.)

In response to the amended complaint, the government filed an "Opposition to Plaintiff's Amended Complaint," which this court recharacterized as a renewed motion to dismiss.  ACCG responded, the government replied, and ACCG filed a surreply.  By correspondence, the court raised a question of subject matter jurisdiction with counsel, who submitted additional briefs addressing the issue.  The court held oral argument on February 14, 2011.  The government filed a supplemental brief providing "supplemental post-hearing clarifications."  ACCG then moved to strike the government's supplemental brief, and filed its own "provisional response."[6]

## II.    SUBJECT MATTER JURISDICTION

Neither party has contested this court's subject matter jurisdiction over this action. Nonetheless, because a defect in subject matter jurisdiction cannot be waived by the parties, the court must satisfy itself that it has jurisdiction.  *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004).

The question of this court's subject matter jurisdiction concerns the relationship between two jurisdictional statutes: 28 U.S.C. §§ 1356 and 1581(i).  28 U.S.C. § 1356 provides:

> The district courts shall have original jurisdiction, exclusive of the courts of the States, of *any seizure* under any law of the United States on land or upon waters not within admiralty and maritime jurisdiction, except matters within the jurisdiction of the Court of International Trade under section 1582 of this title.

---

of 1988, Pub. L. 100-418, § 2502(a), 102 Stat. 1107, 1371 (1988) (Berman Amendment); Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, Pub. L. 103-236, § 525, 108 Stat. 382, 474 (1994) (Free Trade in Ideas Amendment).  Because both of those statutes amended IEEPA, the court will refer to both claims as arising under IEEPA.

[6] Both of the post-hearing supplemental filings have been considered, and ACCG has shown no prejudice. Therefore, ACCG's motion to strike will be denied.

(emphasis added). The basis for ACCG's challenge to the import restrictions is the seizure of the coins it sought to import from London.[7] Moreover, the Court of International Trade ("CIT") does not have jurisdiction over this case under 28 U.S.C. § 1582, and thus the carve-out under § 1356 does not divest this court of jurisdiction.[8] A separate section of Title 28, however, confers "exclusive jurisdiction" on the CIT, a specialized Article III court, over

> any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for—. . .
>
>> (3) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or
>>
>> (4) administration and enforcement with respect to the matters referred to in paragraphs (1)-(3) of this subsection . . .

28 U.S.C. § 1581(i).[9] If the CIT has "exclusive jurisdiction" under § 1581(i), then it would follow that this court does not have jurisdiction.

---

[7] A "seizure" occurs for these purposes when the government "takes control of the merchandise, and may ultimately institute forfeiture proceedings." *R.J.F. Fabrics, Inc. v. United States*, 651 F. Supp. 1431, 1433 (Ct. Int'l Trade 1986). This is in contrast to an "exclusion," which occurs when Customs "den[ies] entry into the customs territory of the United States." *Id.* With an exclusion, "[t]he importer may then dispose of the goods as he chooses." *Id.*; *see also Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 836 (9th Cir. 2001) ("This dichotomy between district court and CIT jurisdiction creates a much-litigated distinction between parties who challenge a *seizure* of goods (who may sue in district court) and parties who challenge a denial of a protest of *exclusion* of goods (who may challenge the denial only in the CIT).") (emphases in original). Here, the parties do not dispute that ACCG's coins were seized, not excluded.

[8] 28 U.S.C. § 1582 provides:
> The Court of International Trade shall have exclusive jurisdiction of any civil action which arises out of an import transaction and which is commenced by the United States—
>> (1) to recover a civil penalty under section 592, 593A, 641(b)(6), 641(d)(2)(A), 704(i)(2), or 734(i)(2) of the Tariff Act of 1930;
>> (2) to recover upon a bond relating to the importation of merchandise required by the laws of the United States or by the Secretary of the Treasury; or
>> (3) to recover customs duties.
This action was not commenced by the United States, and therefore does not arise under § 1582.

[9] The CIT's jurisdiction under 28 U.S.C. § 1581 is "subject to the exception set forth in subsection (j) of this section." Subsection (j) provides, "The Court of International Trade shall not have jurisdiction of any civil action arising under [19 U.S.C. § 1305]." This action does not arise under 19 U.S.C. § 1305, and therefore § 1581(j)'s exclusion to the CIT's jurisdiction is not relevant here. Moreover, a different subsection of § 1581 confers "exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under

Although the language of 28 U.S.C. § 1581(i)(3)-(4) could be read to confer on the CIT exclusive jurisdiction over this action, this court concludes that § 1581(i) does not divest it of jurisdiction in favor of the CIT, for several reasons. First, Congress's decision to limit the carve-out in § 1356 to "matters within the jurisdiction of the Court of International Trade under section 1582," rather than also under §§ 1581, 1583 and 1584, reveals a congressional intent to retain district court jurisdiction in seizure cases that would otherwise fall under CIT jurisdiction under those sections. Congress created the CIT in 1980 and conferred jurisdiction upon it through 28 U.S.C. §§ 1581-84. *See* Customs Courts Act of 1980, Pub. L. No. 96-417, 94 Stat. 1727 (1980). In the same statute, it amended 28 U.S.C. § 1356 to insert the last phrase of the section, transferring from the district courts to the CIT jurisdiction under § 1582. *Id.* § 506. The fact that the amendment of § 1356 was contemporaneous with the enactment of § 1581 is evidence that Congress intended for the district courts to retain jurisdiction over cases such as this one.

Second, the CIT has held that its jurisdiction under § 1581(i) is "residual, meaning it 'may only be invoked when other available avenues of jurisdiction are manifestly inadequate or it is necessary to avoid extraordinary and unjustified delays caused by requiring the exhaustion of administrative remedies.'" *CDCOM (U.S.A.) Int'l, Inc. v. United States*, 963 F. Supp. 1214, 1218 (Ct. Int'l Trade 1997) (quoting *Milin Indus., Inc. v. United States*, 691 F. Supp. 1454, 1456 (Ct. Int'l Trade 1988)). Accordingly, if a party has "meaningful opportunities for protest" of a Customs action, it must exhaust those opportunities *before* § 1581(i) becomes available as a basis for CIT jurisdiction. *Id.* at 1218; *see also R.J.F. Fabrics*, 651 F. Supp. at 1434 ("A party must exhaust meaningful opportunities for protest instead of resorting to § 1581(i) as a

---

[19 U.S.C. § 1515]." 28 U.S.C. § 1581(a). ACCG did not lodge a protest of Customs' actions under 19 U.S.C. § 1515, and therefore does not "contest the denial of a protest." Moreover, "[i]t is well established . . . that the [CIT] lacks jurisdiction under § 1581(a) to review a seizure of goods by Customs." *H&H Wholesale Servs, Inc. v. United States*, 437 F. Supp. 2d 1335, 1340 (Ct. Int'l Trade 2006). Thus the exclusivity of CIT jurisdiction under § 1581(a) does not divest this court of jurisdiction

jurisdictional basis.").  That conclusion does not apply here, because the question is not whether ACCG has exhausted administrative remedies, but rather whether, assuming that ACCG has exhausted administrative remedies, the CIT would have jurisdiction over this action.  Moreover, other CIT cases addressing the adequacy of "other available avenues of jurisdiction" have analyzed whether other avenues of *CIT* jurisdiction were adequate, not whether a district court would have jurisdiction and whether that "avenue[] of jurisdiction" would be adequate.  *See, e.g.*, *Pac Fung Feather Co., Ltd. v. United States*, 911 F. Supp. 529, 533-34 (Ct. Int'l Trade 1995) (holding that the CIT had jurisdiction under §§ 1581(i)(3) and (4) to consider an "arbitrary and capricious" challenge to Customs regulations because other sections of § 1581 were inadequate), *aff'd* 111 F.3d 114 (Fed. Cir. 1997); *Norcal/Crosetti Foods, Inc. v. U.S. Customs Serv.*, 731 F. Supp. 510, 517 (Ct. Int'l Trade 1990) (holding that the CIT had jurisdiction under § 1581(i)(4) because the case "concern[ed] administration and enforcement of the international trade laws" and because "no other subsection of § 1581 would allow plaintiff to invoke this Court's jurisdiction").

The parties have not cited and the court has not found a case addressing whether, if a district court has jurisdiction over a challenge to a government seizure, and because jurisdiction under § 1581(i) is residual, the district court, not the CIT, has jurisdiction over the action. Nonetheless, the "residual" nature of the CIT's jurisdiction under § 1581(i) provides further evidence that this case is properly before this court.  The parties have developed a record and fully briefed the issues.  The issues of judicial review of agency action are of the type typically considered by the district courts, not the type of specialized trade issues that are peculiarly within the expertise of the CIT.  In short, resolution of the case in this court is not "manifestly

inadequate" and would not cause "extraordinary and unjustified delays." *See CDCOM (U.S.A.) Int'l*, 963 F. Supp. at 1218.

Third, the Supreme Court has held that the CIT's jurisdiction does not extend to "*every* suit against the Government challenging customs-related laws and regulations." *Kmart Corp. v. Cartier, Inc.*, 485 U.S. 176, 188 (1988) (emphasis in original). Although the specific holding in *Kmart* does not resolve the tension between 28 U.S.C. §§ 1356 and 1581(i) on the facts of this case, it provides further evidence that Congress did not intend to strip the district courts of jurisdiction over challenges of the type ACCG has brought here.

For these reasons, the court has jurisdiction under 28 U.S.C. § 1356, and § 1581(i) does not divest it of jurisdiction in favor of the CIT.[10]

## III.    STANDARD OF REVIEW

The government has moved to dismiss or, in the alternative, for summary judgment. "[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (internal quotation marks and alterations omitted) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). "Even though the requirements for pleading a proper complaint are substantially aimed at assuring that

---

[10] Because the court concludes that the CIT does not have exclusive jurisdiction under § 1581(i) in any event, the court need not decide whether the import restrictions constitute a "governmental," rather than a private, restriction on imports, *see Kmart Corp.*, 485 U.S. at 185; whether the Customs regulations impose an "embargo" or "quantitative restriction[]" on imports, *see* 28 U.S.C. § 1581(i)(3); whether ancient coins are "merchandise," *see id.*; or whether the restrictions were imposed "for reasons other than the protection of the public health or safety." *See id.*

the defendant be given adequate notice of the nature of a claim being made against him, they also provide criteria for defining issues for trial and for early disposition of inappropriate complaints." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009).

To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and alterations omitted). Thus, the plaintiff's obligation is to set forth sufficiently the "grounds of his entitlement to relief," offering more than "labels and conclusions." *Id.* (internal quotation marks and alterations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937, 1950 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).

## IV. ACCG'S CHALLENGE TO THE IMPORT RESTRICTIONS

ACCG challenges the actions of two agencies, the State Department and Customs and Border Protection, and two officials, the Assistant Secretary of State for Educational and Cultural Affairs and the Commissioner of Customs. It argues that by imposing import restrictions on Cypriot and Chinese coins, those agencies and officials violated the APA and the Constitution, and exceeded their authority under the CPIA. The court will first consider ACCG's challenge to the actions of the State Department and the Assistant Secretary, and then turn to the challenge to the actions of Customs and the Commissioner. In challenging the actions of the State Department and the Assistant Secretary, ACCG argues that it is entitled to judicial review under the APA, under "nonstatutory review" of *ultra vires* actions (Am. Compl. ¶¶170-77), and

under the court's "inherent equitable powers to remedy constitutional violations." (*Id.* ¶¶112, 118.)

The question of the validity of these actions is squarely before this court. As noted above, when the government seeks the forfeiture of cultural property subject to import restrictions under the CPIA, the initial burden is on the government to show that the material "has been listed by the Secretary" of the Treasury (or his delegate) on a designated list. 19 U.S.C. § 2610(1).[11] To meet its burden here, the government relies on the invoice that accompanied ACCG's coins when they were shipped from London. (*See* Defs.' Mem. at 4-5.) For each coin, the invoice provided the place of origin, the approximate date of origin, and a description. (Defs.' Mem., Ex. 1, at 5.) The invoice also stated, for each coin, "No recorded provenance" and "Find spot unknown." (*Id.*) This invoice was sufficient to satisfy the government's burden of showing that the coins were among those "listed by the Secretary" on the designated lists for China and Cyprus. The burden then shifted to ACCG to show that the coins were legally importable. 19 U.S.C. § 2606. By letter, ACCG expressly disclaimed any ability to make such a showing. (Defs.' Mem., Ex. 1, at 10.) Indeed, ACCG does not argue that its coins are not "of Cypriot types made of gold, silver, [or] bronze," 72 Fed. Reg. at 38,473, or among the Chinese coins described on the designated list for China, 74 Fed. Reg. at 2,842.

---

[11] At least one court has held, and the parties here agree, that this burden requires the government to show "probable cause" to believe the property is subject to forfeiture. *See United States v. An Original Manuscript Dated November 19, 1778,* No. 96 Civ. 6221(LAP), 1999 WL 97894, *5 (S.D.N.Y. Feb. 22, 1999); Defs.' Mem. at 4; Pl.'s Surreply at 6. The "probable cause" standard is provided by 19 U.S.C. § 1615, which applies in forfeiture actions "under the provisions of any law relating to the collection of duties on imports or tonnage." This court need not decide whether the burden imposed on the government by 19 U.S.C. § 2610(1) is synonymous with, or incorporates, the "probable cause" standard in § 1615, because there is no dispute that ACCG's coins appeared on a designated list. Moreover, although CAFRA altered the burden of proof in certain forfeiture actions, *see* 18 U.S.C. § 983(c) ("In a suit or action brought under any civil forfeiture statute for the civil forfeiture of any property . . . the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture."), the statute does not apply to seizures pursuant to "the Tariff Act of 1930 or any other provision of law codified in title 19," *id.* § 983(i)(2)(A), and therefore does not apply here.

Therefore, there is no dispute that ACCG's coins appeared on a designated list. Rather, the parties' principal dispute is over whether the defendants had authority under the CPIA to restrict the importation of those coins.[12]

## A. Judicial Review of State Department Actions

### 1. APA Review

Section 706(2) of the APA provides that a reviewing court

> shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law . . . .

5 U.S.C. § 706(2). ACCG alleges that the actions of the State Department and the Assistant Secretary that culminated in the promulgation of import restrictions on Chinese and Cypriot coins violated one or more subsections of § 706(2) because State "failed to provide a reasoned explanation for its departure from prior agency precedent" (Am. Compl. ¶123), failed "to report

---

[12] The clarity and specificity of the invoice renders this case distinguishable from *United States v. Eighteenth Century Peruvian Oil,* 597 F. Supp. 2d 618 (E.D. Va. 2009) and *An Original Manuscript,* 1999 WL 97894 at *1. In *Eighteenth Century Peruvian Oil,* the government sought the forfeiture of two paintings it alleged were produced in Peru and appeared on a designated list pursuant to a Memorandum of Understanding with Peru. 597 F. Supp. 2d at 621-22. The claimant disputed the origin, asserting that the paintings were produced in Bolivia. *Id.* at 623. Accordingly, the government needed other evidence to show that the paintings appeared on the designated list for Peru. To do so, it relied on the reports of three art experts, each of whom stated that the paintings originated in Peru. *Id.* Similarly, *Original Manuscript* involved a manuscript that was alleged to have been stolen from a museum in Mexico City. 1999 WL 97894 at *2. The government sought the forfeiture of the manuscript under 19 U.S.C. § 2610(2), under which the government's initial burden, rather than showing the material was "listed by the Secretary," *id.* § 2610(1), is to show the article was "documented as appertaining to the inventory" of a foreign museum and "was stolen from such institution" after a certain date. *Id.* § 2610(2). Because the claimant asserted that the painting had been "disbursed" by the museum rather than stolen, the government needed other evidence to show the painting was stolen. 1999 WL 97894 at *2. To do so, it relied on a statement that a matching description appeared in the museum's records from 1993 and the manuscript later was missing from the museum's collection. *Id.* at *6. Here, the government did not need to rely on the types of evidence relied on in those cases because the invoice alone was sufficient to show that ACCG's coins were among those listed on the designated lists for China and Cyprus.

to Congress about this departure from both prior agency practice and the recommendations of [CPAC]" (*id*. ¶130), was influenced by "bias, and/or prejudgment and/or *ex parte* contact" (*id*. ¶135), misallocated the burden of proof for seizing imported coins in violation of the CPIA (*id*. ¶¶141-43), violated IEEPA by imposing import restrictions on materials protected by the First Amendment (*id*. ¶¶ 153-54), and violated the First and Fifth Amendments by imposing import restrictions that are vague and overbroad, are content-based prior restraints on speech, and burden ACCG's "Fifth Amendment liberty collecting and trading in informational materials." (*Id*. ¶¶160-67.)[13]  The government argues that the actions of the State Department and the Assistant Secretary are not reviewable under the APA because they were acting pursuant to delegated presidential authority, and the President is not an "agency" for APA purposes.  *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).

Under the CPIA, Congress assigned to the President various responsibilities, from publishing notice of a state party request, 19 U.S.C. § 2602(f)(1), to determining whether factual prerequisites for entering an Article 9 agreement have been met, *id*. § 2602(a)(1); from negotiating and entering into an Article 9 agreement with the requesting state party, *id*. § 2602(a)(2), to submitting a report to Congress with a description of particular import restrictions. *Id*. § 2602(g).  As detailed above, the President has since delegated the responsibilities relevant here to the Assistant Secretary.  ACCG seeks APA review of several of these actions.  Judicial review under the APA, however, is only available with respect to "agency" actions.  *See* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review

---

[13] Although AGGC alleges that the defendants' actions were arbitrary and capricious for other reasons as well, the alleged violations listed above are those arguably attributable to the State Department.  The alleged violations arguably attributable to Customs will be discussed below.

thereof."). The President is not an "agency" within the meaning of the APA. *Franklin*, 505 U.S. at 801. As the Supreme Court explained:

> The President is not explicitly excluded from the APA's purview, but he is not explicitly included, either. Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA. We would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion.

*Id.* at 800-801. Thus, presidential actions "are not reviewable for abuse of discretion under the APA." *Id.* at 801.

Here, ACCG challenges actions by the State Department and Assistant Secretary, not actions directly undertaken by the President. The State Department and Assistant Secretary's authority to impose import restrictions on Cypriot and Chinese coins, however, derives from the President's authority under the CPIA. This raises the following question: does the bar on APA review of actions by the President extend to the actions of agencies when they act under a delegation of presidential authority? In other words, does an agency cease to be an "agency" for APA purposes when it acts pursuant to delegated presidential authority, rather than pursuant to authority conferred directly to the agency by statute?[14] Neither the Supreme Court nor, apparently, any Court of Appeals has addressed this question directly.[15] Three district courts

---

[14] A different question would be raised if the State Department's actions on behalf of the President were merely "ceremonial or ministerial." *Franklin*, 505 U.S. at 800. In that scenario, agency action that preceded the State Department's action would still be reviewable as "final agency action"; the ceremonial or ministerial task assigned to the President would not defeat the finality of the preceding agency action. *Id.* Here, ACCG does not, and could not, argue that the actions assigned to the President under the CPIA are merely "ceremonial or ministerial." Accordingly, the discussion of "ceremonial or ministerial" presidential actions in *Franklin* has no bearing here.

[15] Although the issue arose before the D.C. Circuit in *Tulare County v. Bush*, 306 F.3d 1138 (D.C. Cir. 2002), the court found it unnecessary to address it. The district court had held that actions of the Forest Service in managing Grand Sequoia National Monument were not "agency" actions, and thus not reviewable under the APA, because the Forest Service was "merely carrying out directives of the President." *Tulare County v. Bush*, 185 F. Supp. 2d 18, 28-29 (D.D.C. 2001). On appeal, the D.C. Circuit concluded that it did not need to address whether the Forest Service's actions were unreviewable presidential actions because the plaintiffs did not "identify these foresters' acts with sufficient specificity to state a claim." *Tulare County*, 306 F.3d at 1143. Moreover, although the Ninth Circuit

have held that where an agency acts on behalf of the President, those acts remain those of the President for APA purposes; they do not become reviewable as actions of an "agency." *See Natural Resources Defense Council v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 109 (D.D.C. 2009) ("*NRDC*") (holding that because the State Department, in deciding whether to issue presidential permits for cross-border oil pipelines, was "acting solely on behalf of the President," its actions were those of the President and thus were unreviewable under the APA); *Sisseton-Wahpeton Oyate*, 659 F. Supp. 2d at 1082 (holding that when the State Department issues an environmental impact statement under authority delegated by the President, its actions "are presidential in nature, and therefore, do not confer upon the plaintiffs a private right of action under the APA"); *Tulare County*, 185 F. Supp. 2d at 28-29 (holding that because the Forest Service, in managing Grand Sequoia National Monument pursuant to a presidential proclamation, was "merely carrying out directives of the President," its actions were not reviewable under the APA. One district court has disagreed with those courts, holding instead that the State Department's issuance of a presidential permit for a cross-border oil pipeline constitutes "agency" action reviewable under the APA. *Sierra Club v. Clinton*, 689 F. Supp. 2d 1147, 1157 (D. Minn. 2010).[16]

---

addressed the issue in *Jensen v. National Marine Fisheries Service*, 512 F.2d 1189, 1191 (9th Cir. 1975), the case predates *Franklin*, and in any event the court analyzed the issue principally as a question of whether the political question doctrine rendered the case non-justiciable, not whether the Secretary of State is an "agency" for purposes of the APA. *Id.*

[16] The government seeks to distinguish *Sierra Club* by arguing that the issuance of the permit and the corresponding preparation of an environmental impact statement there involved not only the State Department, but also other government agencies, such as the Corps of Engineers, which indisputably were "agencies" acting pursuant to their own statutory authority, not pursuant to authority delegated by the President. In contrast, the government argues, here the State Department was acting solely on the basis of delegated presidential authority. The *Sierra Club* court did not, however, analyze the issue in those terms. Rather, it expressly held that the State Department's actions were reviewable as "final agency action," even though the Department was acting pursuant to delegated presidential authority. 689 F. Supp. 2d at 1157. Moreover, the court expressly stated that it was declining to follow the reasoning of the courts in *NRDC* and *Sisseton-Wahpeton Oyate*. *Id.* at 1157 n.3.

Of those four cases, however, three involved delegations of authority the President derived solely, or at least primarily, from his inherent constitutional authority over foreign affairs, rather than authority the President derived from a statute. *See Sisseton-Wahpeton Oyate*, 659 F. Supp. 2d at 1081 ("[T]he President has the sole authority to allow oil pipeline border crossings under his inherent constitutional authority to conduct foreign affairs."); *NRDC*, 658 F. Supp. 2d at 109; *Sierra Club*, 689 F. Supp. 2d. at 1163.[17] Although the issues that arise in those two contexts largely overlap, they are not identical. In this case, the President's authority to negotiate and implement cultural property import restrictions derives at least primarily from a statute, the CPIA.[18]

Nonetheless, the State Department and Assistant Secretary were acting on behalf of the President, and therefore their actions are not reviewable under the APA. That conclusion is particularly justified here, because the Department and Assistant Secretary were acting in the realm of foreign affairs. The Court's conclusion in *Franklin* that the President's actions are not reviewable under the APA was premised on "the separation of powers and the unique constitutional position of the President." 505 U.S. 788 at 800. Although agencies, such as the State Department here, occupy a different "constitutional position" than does the President, when those agencies act on behalf of the President, the separation of powers concerns ordinarily apply with full force—especially in an area as sensitive and complex as foreign affairs. As with respect to almost any international agreement, the decision whether to enter an Article 9

---

[17] In *Tulare County*, the President's authority derived from the Antiquities Act, which authorized the President, "in his discretion," to designate federal land as national monuments. 185 F. Supp. 2d at 21.

[18] The President's authority is "at least primarily," rather than "solely," derived from the CPIA because, conceivably, even absent the CPIA the President would have some authority to negotiate treaties concerning cultural property, pursuant to the President's inherent constitutional authority over foreign affairs. To the extent the source of the President's authority bears on the availability of judicial review under the APA, it is important to recognize that the President's authority in a particular area can be derived from a combination of statutory and constitutional sources. *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585-88 (1952) (looking first to statutes, and then to the Constitution, to determine whether the President was authorized to seize the steel mills).

agreement with a particular country does not occur in a foreign policy vacuum. The decision necessarily will involve a variety of considerations beyond those set out in the CPIA, including the broader relationship between the United States and the requesting country and the potential impact of such an agreement on the United States's relationships with other countries. Those considerations exist regardless of who ultimately negotiates and enters the agreement, the President or the Assistant Secretary on the President's behalf. Furthermore, by lodging primary responsibility for imposing cultural property import restrictions with the President, rather than with an agency, Congress likely recognized these separation-of-powers concerns. While the parties have not pointed to a conclusive explanation in the CPIA's legislative history, Congress likely concluded that deference to the President was appropriate given the foreign policy considerations inherent in deciding whether to impose import restrictions.[19] For these reasons, actions taken pursuant to delegated presidential authority under the CPIA will not be held subject to review under the APA.

ACCG also argues that even if the actions of the State Department and Assistant Secretary were not agency action reviewable under the APA, the promulgation of the designated lists by Customs rendered the State Department actions reviewable. The parties agree that judicial review under the APA requires "final agency action," that Customs is an "agency" for APA purposes, and that its actions were "final." Moreover, so long as there is "final agency action" presented for review, intermediate agency actions that culminated in that final action are also reviewable. 5 U.S.C. § 704 ("A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action.").

---

[19] To be clear, the court is not concluding that judicial review is impliedly precluded by statute under 5 U.S.C. § 701(a)(1). Although Congress's decision to assign responsibility to the President for most responsibilities under the CPIA, along with the foreign affairs implications of imposing import restrictions, strongly indicate such preclusion, the court need not reach the issue because review is otherwise precluded for the reasons discussed above.

But § 704 only renders intermediate actions reviewable if those actions, in addition to the final action, were those of an "agency." For the reasons discussed above, the actions of the State Department and the Assistant Secretary were not those of an "agency."[20] Therefore, the reviewability of Customs' actions does not render reviewable the actions of the State Department or the Assistant Secretary.

For these reasons, to the extent ACCG challenges the actions of the State Department and the Assistant Secretary, those actions are not reviewable under the APA, and ACCG has failed to state a claim on which relief can be granted.[21]

### 2. *Ultra vires* review

As an alternative to judicial review under the APA, ACCG seeks judicial review under "nonstatutory" or "*ultra vires*" review. Under the purview of *ultra vires* review, it alleges that the State Department and Assistant Secretary acted beyond the scope of their authority under the CPIA for two principal reasons. First, it argues that because the CPIA authorizes restrictions on the importation of items "first discovered within" a requesting state, and because the restrictions here apply to all coins of certain Chinese and Cypriot types without requiring the government to prove that particular coins were "discovered" within the requesting state, the restrictions are not authorized by the CPIA. Second, it argues that the State Department and the Assistant Secretary

---

[20] There is a separate line of cases interpreting the term "agency" under FOIA. *See, e.g.*, *Armstrong v. Exec. Office of the President*, 90 F.3d 553, 558 (D.C. Cir. 1996); *Meyer v. Bush*, 981 F.2d 1288, 1293 (D.C. Cir. 1993). Although the issues overlap somewhat, particularly because the APA's definition of "agency" largely overlaps with FOIA's definition of the term, those cases are distinguishable because the concerns underlying FOIA determinations are different from those underlying *Franklin*.

[21] Because the court concludes that APA review is not available because the State Department was acting on behalf of the President, who is not an "agency" for APA purposes, it does not reach the defendants' alternative arguments for why APA review is unavailable, namely that the State Department's actions are "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), that the State Department's actions are exempt from the APA as part of the "foreign affairs function of the United States," *id.* § 553, and that the ACCG has not shown that "there is no other adequate remedy in a court" as required by § 704. The court also need not resolve the parties' dispute about whether the State Department's negotiation of article 9 agreements constituted "final" actions for APA purposes, because irrespective of whether the conclusion of those agreements was "final," it was not "agency" action.

imposed restrictions on Chinese coins without a request from China to do so, despite the fact that such a request is required under the CPIA.  (*Id.* ¶135.)

In *Dalton v. Specter*, a lawsuit to enjoin the closing of a Naval shipyard, the Supreme Court "assume[d] for the sake of argument" that even if the APA does not establish judicial review of presidential actions, "some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA."  511 U.S. at 474.  That assumption, however, did not provide the plaintiffs in *Dalton* the judicial review they sought. The Court held that because the statute in question "[did] not at all limit the President's discretion," *id.* at 476, and because "longstanding authority" holds that judicial review to determine whether the President complied with a statutory mandate "is not available when the statute in question commits the decision to the discretion of the President," judicial review was unavailable.  *Id.* at 474-75.[22]

"A somewhat different case is presented, however, where the authorizing statute or another statute places discernible limits on the President's discretion."  *Mountain States Legal Found.*, 306 F.3d at 1136.  In other words, "*Dalton*'s holding merely stands for the proposition that when a statute entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available."  *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1331 (D.C. Cir. 1996); *see also id.* at 1331 n.5 (explaining why *Dalton*'s limited bar to judicial review of presidential actions does not "repudiate *Marbury v. Madison*").  Even if a statute does not provide for judicial

---

[22] This bar on non-APA reviewability is similar to the APA's bar on reviewability where "agency action is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  Just as judicial review of agency action is unavailable under the APA when there is "no law to apply," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971), *ultra vires* review of presidential action is unavailable when there are no "discernible [statutory] limits on the President's discretion."  *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002).

review, "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Id.* at 1328 (citing *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)).

The CPIA, unlike the statute in *Dalton*, provides discernible limits on the President's discretion.[23] Even where *ultra vires* judicial review is available, however, the scope of that review is limited. Notably for the purposes of this case, *ultra vires* review does not include the full scope of review applied by courts in "arbitrary and capricious" challenges under the APA, such as whether an agency "cogently explain[ed] why it has exercised its discretion in a given manner." *See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1993). Rather, *ultra vires* review is limited to whether the President has violated the Constitution, the statute under which the challenged action was taken, or other statutes, or did not have statutory authority to take a particular action. *Mountain States Legal Found.*, 306 F.3d at 1136; *Tulare County*, 306 F.3d at 1138.

Thus, this court will proceed to consider whether the State Department and Assistant Secretary exceeded their authority under the CPIA.

### i. The "first discovered" requirement

ACCG first alleges that the State Department and the Assistant Secretary's actions were *ultra vires* because the regulations imposing the import restrictions do not require the government to prove that a particular coin was discovered in the modern countries of China or Cyprus before it may seize the coin. (*See* Am. Compl. ¶¶173-74.) ACCG argues that many

---

[23] The President may impose import restrictions, but only if "the cultural patrimony of the State Party is in jeopardy from the pillage of archaeological or ethnological materials," "the State Party has taken measures consistent with the Convention to protect its cultural patrimony," import restrictions "would be of substantial benefit in deterring a serious situation of pillage," "remedies less drastic . . . are not available," and the imposition of import restrictions "is consistent with the general interest of the international community in the interchange of cultural property among nations for scientific, cultural, and educational purposes." 19 U.S.C. § 2602(a)(1).

ancient coins, including those produced in Cyprus and China, circulated widely in the ancient world.  Cypriot coins were used in international trade and thus circulated beyond the island's shores, and empires such as the Persian and Roman empires produced coins on Cyprus that were indistinguishable from coins produced outside of Cyprus.  Similarly, coins produced in China circulated widely, and other countries in Asia copied the design of Chinese coins.[24]  Given the wide circulation of Cypriot and Chinese coins in ancient times, ACCG argues, only a subset of those coins remained in Cyprus or China.  As a result, in modern times, such coins are regularly "discovered" in many different countries.

The CPIA, as noted above, only authorizes the President to designate archaeological materials as subject to import restrictions if those materials were "first discovered within, and . . . subject to export control by" the requesting state party.  19 U.S.C. § 2601(2).  Given the wide circulation of ancient Cypriot and Chinese coins, ACCG argues, the President does not have

---

[24] ACCG describes its historical argument in detail in its amended complaint:

> 14.  Western coinage originated in Asia Minor sometime around the 7th c. B.C. This innovation soon spread to the Greek mainland and islands like Cyprus. The first true Cypriot coins date from the late 6th c. B.C., when various Cypriot kingdoms began to issue coin types derived from designs on coins from the East that had arrived on Cyprus in trade.  Subsequently, the Persian Empire, Alexander the Great, the Ptolemaic Kingdom and the Romans struck coins on the Island, which were often indistinguishable from coins struck at their other imperial mints.  Because Cyprus is located on an important trade route, coins minted in Cyprus circulated widely around the Mediterranean region and even as far away as Afghanistan.  Accordingly, it is impossible to determine a Cypriot coin's find spot merely from identifying it as being made at a Cypriot mint.
>
> 15.  Coinage began in China in the late 7th or early 6th c. B.C. The earliest money was cast into the form of spades, knives or cowry shells.  Ultimately, by around 221 B.C., a round bronze coin marked with Chinese characters referencing values and issuing authorities and featuring a square center hole became standardized.  These "cash" coins were produced in immense numbers from roughly 221 B.C. to 1912 A.D.  This type was widely emulated from Central Asia to Japan, with similar types being cast in Vietnam as late as 1933.
>
> 16.  The circulation patterns of Chinese cash coins were equally wide, with such coins being exported in quantity from the Fifth to Tenth Centuries to East Africa, the Persian Gulf, India, Ceylon, Burma, Thailand, Vietnam, Malaya, the Philippines, Sumatra, Java and Borneo.  Later on, Chinese immigrants even took such coins with them to the United States.  Accordingly, it also is impossible to determine a Chinese coin's find spot merely from identifying it as being made at a Chinese mint.

(Am. Compl. ¶¶ 14-16.)

authority under the CPIA to restrict all of certain types of Cypriot and Chinese coins without requiring the government to prove that they were "discovered within" Cyprus or China in modern times.  Moreover, according to ACCG, although the statute does not require that the coins be discovered in the requesting country *in modern times*, the requirement is implied in the use of the term "discovered."  "[M]erely identifying coins by country of origin is statutorily insufficient," ACCG argues, "for if this were all that were required, Congress would have emphasized the place of 'production' rather than the place of 'discovery.'"  (Pl.'s Surreply at 6 (quoting Stephen Urice & Andrew Adler, *Unveiling the Executive Branch's Extralegal Cultural Policy* 34 (Miami Law Research Paper Series August 12, 2010)).)[25]

---

[25] In a related argument, ACCG correctly observes that 19 C.F.R. § 12.104, the regulation governing the enforcement of the CPIA, conflicts in an important respect with the CPIA.  As stated above, the CPIA defines "archaeological or ethnological material of the State Party" as:

    (A)    any object of archaeological interest;

    (B)    any object of ethnological interest; or

    (C)    any fragment or part of any object referred to in subparagraph (A) or (B);

which was first discovered within, and is subject to export control by, the State Party.

19 U.S.C. § 2601(2).  The last phrase modifies all three preceding subsections.  That is, irrespective of whether an object is "of archaeological interest," "of ethnological interest," or a fragment of such an object, the object must have been "first discovered within" and "subject to export control by" the country requesting import restrictions.  As indicated above, § 2601(2) then continues with more detailed definitions of "archaeological interest" and "ethnological interest."  The C.F.R. section defines "archaeological or ethnological material of the State Party" as:

    (1)    Any object of archaeological interest. . . .

    (2)    Any object of ethnological interest . . .

    (3)    Any fragment or part of any object referred to in paragraph (a) (1) or (2) of this section which was first discovered within, and is subject to export control by the State Party.

19 C.F.R. § 12.104(a).  In the regulation, the phrase "which was first discovered within, and is subject to export control by, the State Party" modifies only the third type of object subject to the definition, namely "fragment[s] or part[s]" of objects.  Therein lies the conflict with the CPIA.

    Congress only authorized the imposition of import restrictions on objects that were "first discovered within, and [are] subject to export control by the State Party."  Under the regulations, that requirement seems to apply only to the importation of a "fragment or part" of an object of archaeological or ethnological interest.  This appears to have been an oversight in the drafting, or codification, of the original regulations in 1985, and has persisted in the C.F.R. ever since.  *See* Interim Customs Regulations Amendments Concerning Convention on Cultural Property Implementation Act, 50 Fed. Reg. 26,193 (June 25, 1985).

    Nonetheless, the court need not decide whether the conflict between 19 U.S.C. § 2601(2) and 19 C.F.R. § 12.104(a) requires that the regulation be set aside, because the government concedes that the "first discovered within" requirement applies to all CPIA import restrictions.  Therefore, for the purposes of this case, it is

33

For each designated type of coin, assuming an importer does not have a "certification or other documentation" from the state party that "exportation was not in violation of the laws of the State Party," 19 U.S.C. § 2606(a), coins could fall into one of three categories, depending on whether there is documentation of where a coin was discovered, known as its "find spot": (1) coins that are proven to have been discovered in modern-day China or Cyprus, (2) coins that are proven to have been discovered somewhere other than China or Cyprus, and (3) coins for which the "find spot" is unknown. ACCG concedes that the State Department has authority to prohibit the importation of coins in the first category. The government concedes that it does not have authority to prohibit coins in the second category. The parties' dispute is limited to whether the State Department has authority under the CPIA to prohibit the importation of coins with unknown "find spots," as the State Department has done here. For example, one category of coins on the designated list is gold coins issued by the Cypriot kingdom of Amathus. *See* 72 Fed. Reg. at 38,473. This category of coins thereby became "designated archaeological or ethnological material." *See* 19 U.S.C. § 2601(7). An importer wishing to import a gold Amathus coin would have to present either a certification by Cyprus that the coin did not violate Cyprus's export laws, *id.* § 2606(b)(1), or a declaration under oath that the coin was exported from Cyprus prior to 2007, when the category of coins was added to the designated list. *Id.* § 2606(b)(2)(B).[26] Accordingly, if there is no record of when and where the coin was discovered, or of when it was exported from Cyprus, then importation of the coin is prohibited. This result, ACCG argues, violates the "first discovered" requirement in the CPIA.

---

unnecessary for this court to decide whether 19 C.F.R. § 12.104(a) violates the APA or exceeds the statutory authority of Customs, the Department of Homeland Security, or the Treasury Department.

[26] In this example, § 2606(b)(2)(A), which provides an importer with the option to show that the object was exported from Cyprus ten or more years before entering the U.S., would not come into play, because Cypriot coins were added to the designated list for the first time in July 2007, less than ten years ago.

ACCG's argument misses the mark, for three principal reasons. First, the subsection imposing the "first discovered" requirement, 19 U.S.C. § 2601(2), is silent on how the government must establish, in the absence of a documented find spot, whether a particular object "was first discovered within, and is subject to export control by, the State Party." Moreover, the CPIA anticipates that there may be some archaeological objects without precisely documented provenance and export records and prohibits the importation of those objects. Section 2606(b)-(c) of the CPIA provides that if an importer is "unable to present" a certification from the state party or the "satisfactory evidence" described above for a particular coin, the coin "shall be subject to seizure and forfeiture." 19 U.S.C. § 2606(b)-(c). Thus for objects without documentation of where and when they were discovered, the CPIA expressly places the burden on importers to prove that they are importable, and prohibits the importation of those objects if they cannot meet that burden.

Second, the CPIA anticipates that some categories of materials will be designated "by type or other appropriate classification." *Id.* § 2604. Congress apparently recognized that sometimes neither the requesting country nor the U.S. government will have enough information to list particular items with greater specificity than its "type." This language further demonstrates that the State Department would not have exceeded its authority under the CPIA by directing Customs to prohibit all coins of particular types, rather than only coins with proven find spots in China or Cyprus.

Third, interpreting the "first discovered in" requirement to preclude the State Department from barring the importation of archaeological objects with unknown find spots would undermine the core purpose of the CPIA, namely to deter looting of cultural property. *See* 19 U.S.C. § 2602(a)(1)(A) (providing that the first factual prerequisite for import restrictions is that

"the cultural patrimony of the State Party is in jeopardy from the pillage of archaeological or ethnological materials of the State Party"); *see also* Cultural Property Convention art. 9 ("Any State Party to this Convention whose cultural patrimony is in jeopardy from pillage of archaeological or ethnological materials may call upon other States Parties who are affected.") Looted objects are, presumably, extremely unlikely to carry documentation, or at least accurate documentation, of when and where they were discovered and when they were exported from the country in which they were discovered. Congress is therefore unlikely to have intended to limit import restrictions to objects with a documented find spot.[27]

For these reasons, the import restrictions on Chinese and Cypriot coins, which have the effect of barring the importation of coins with unknown find spots, do not exceed the State Department's authority under the CPIA.[28] ACCG's request to find the State Department and Assistant Secretary's actions *ultra vires* on this basis will be dismissed.

### ii. Chinese request for import restrictions

As its second *ultra vires* claim, ACCG alleges that the State Department and the Assistant Secretary exceeded their authority under the CPIA because they imposed restrictions

---

[27] Moreover, ACCG's argument, if taken to its logical conclusion, could bring into question the import restrictions on every, or almost every, item on the designated lists. (*See* Transcript of Motions Hearing (Feb. 14, 2011), ECF No. 35, at 21-22.)

[28] Arguably, the question whether the State Department's regulations are valid under the APA could be seen as a *Chevron* question. *See Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837 (1984); *Aid Assoc. for Lutherans v. U.S. Postal Service*, 321 F.3d 1166, 1176 (D.C. Cir. 2003) (employing the *Chevron* analysis in deciding whether the Postal Service acted *ultra vires* when it adopted regulations concerning non-profit reduced-rate postage and interpreted the statutory term "coverage" to mean "type of insurance," such as life or health insurance, rather than as "the inclusion or exclusion of specific risks"). Under *Chevron* Step One, the question would be whether the "first discovered within" requirement in the CPIA "permits or clearly excludes the possibility of" barring the importation of coins with unknown find spots. *See* Kenneth A. Bamberger & Peter L. Strauss, *Chevron's Two Steps*, 95 Va. L. Rev. 611, 611 (2009). If the CPIA permits the possibility of the Department's interpretation, under Step Two the question would be whether that interpretation is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843; *see* Bamberger & Strauss, *Chevron's Two Steps*, *supra*, at 623-24 ("Step Two analysis considers whether agencies have permissibly exercised the interpretive authority delegated to them by reasonably employing appropriate methods for elaborating statutory meaning."). The parties have not analyzed the question in *Chevron* terms, however, and therefore neither will the court.

on Chinese coins without a request from China to do.  As noted above, the CPIA only authorizes the President (and by extension the State Department) to impose import restrictions "after request is made to the United States under article 9 of the Convention by any State Party."  19 U.S.C. § 2602(a)(1).  Although at the motion-to-dismiss stage the court must "accept the well-pled allegations of the complaint as true," *Ibarra*, 120 F.3d at 474, the court may also take judicial notice of public records.  *Papasan v. Allain*, 478 U.S. 265, 269 n. 1 (1986); *Secretary of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007); *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1222 (D.C. Cir. 1993).  Moreover, the contents of the Federal Register are the type of public records subject to judicial notice.  44 U.S.C. § 1507.

Here, the State Department published in the Federal Register a notice that it had received a request on May 27, 2004 from China to impose import restrictions on certain "Chinese archaeological material from the Paleolithic to the Qing Dynasty."  69 Fed. Reg. at 53,970.  This request eventually led to the negotiation of a memorandum of understanding and the promulgation of a designated list that included coins.  74 Fed. Reg. at 2,842.  Although the September 2004 notice does not specifically state that China's request included coins, the CPIA does not require that a state party's initial request include a detailed accounting of every item eventually covered by an Article 9 agreement.  Nor does the CPIA require that the State Department publish verbatim the list of items requested to be restricted.  Rather, it simply requires that a State Party make a "request . . . to the United States under article 9 of the Convention," 19 U.S.C § 2602(a)(1), and "publish notification of the request . . . in the *Federal Register*."  *Id.* § 2602(f)(1).  The notice published in the September 3, 2004, Federal Register demonstrates that such a request was made.  Accordingly, the State Department did not initiate

the process to impose import restrictions without a request having been made by China. ACCG's claim to the contrary will be dismissed.

### iii. *ACCG's other* **ultra vires** *claims*

ACCG also alleges that the defendants acted *ultra vires* because they violated the First and Fifth Amendments to the Constitution, as well as IEEPA, and because the decisions to impose import restrictions were "based on bias and/or prejudgment and/or *ex parte* contact." The constitutional claims are considered separately below. The IEEPA claim is easily rejected. IEEPA authorizes the President to impose sanctions in response to "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). The Berman Amendment and the Free Trade in Ideas Amendment exempt informational materials from import restrictions imposed under IEEPA. *See* § 1702(b) ("The authority granted to the President *by this section* does not include the authority to regulate . . . the importation . . . of any information or informational materials.") (emphasis added). The government does not assert that its authority to seize the ACCG's coins in any way derived from IEEPA. Rather, the authority of State and Customs to impose import restrictions and then seize the coins derived from the CPIA. The informational materials exemption under IEEPA, therefore, is irrelevant to the scope of their authority under the CPIA.

Moreover, ACCG's claim that the import restrictions were "based on bias and/or prejudgment and/or *ex parte* contact" is beyond the scope of *ultra vires* review. As stated above, *ultra vires* review is limited to claims that the President has exceeded his authority under a particular statute, has violated another statute, or has violated the Constitution. *Mountain States*,

306 F.3d at 1136.  ACCG's bias claim is not an allegation of *ultra vires* action.  Rather, it is merely a restatement of its claim for arbitrary and capricious review under the APA.  *Ultra vires* review, however, does not encompass the type of relatively searching review courts apply under arbitrary and capricious review of agency action.  Accordingly, to the extent the Ninth Cause of Action alleges that the import restrictions were *ultra vires* based on the Berman Amendment and the Free Trade in Ideas Amendment to IEEPA, or because they were "based on bias and/or prejudgment and/or *ex parte* contact," those claims will be dismissed.

For these reasons, ACCG is not entitled to a declaration that the State Department and the Assistant Secretary's actions were *ultra vires*.  The plaintiff's Ninth Cause of Action, insofar as it is brought against the State Department and the Assistant Secretary, will be dismissed.

### 3.  Constitutional review

In addition to arguing that the State Department's actions violated the APA and were *ultra vires*, ACCG argues that the Department violated the First Amendment.  ACCG argues that irrespective of the availability of judicial review under the APA or for *ultra vires* actions, the State Department and the Assistant Secretary's actions are reviewable under this court's "inherent equitable powers to remedy constitutional violations."  (Am. Compl. ¶¶112, 118.) Indeed, while judicial review is unavailable under the APA, and the State Department and Assistant Secretary did not act *ultra vires*, that does not dispose of ACCG's constitutional claims, because "the President's actions may still be reviewed for constitutionality."  *Franklin*, 505 U.S. at 801 (citing *Webster v. Doe*, 486 U.S. 592, 603-605 (1988); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935)).

ACCG argues that the import restrictions on Cypriot and Chinese coins violate the First Amendment because they are "a content-based restriction on protected speech that is not

narrowly tailored to serve a compelling government interest."  (Pl.'s Opp'n at 25; *see also* Am. Compl. ¶160.)  ACCG argues that "inscription and motif" on an ancient coin constitute "information or speech" because they communicate "the ethos of a people, the means by which the ancient society expressed that ethos, and the individual expression of the coin maker."  (Pl.'s Opp'n at 26.)  Accordingly, ACCG argues, the import restrictions are content-based restrictions on speech that receive strict scrutiny.  (*Id.* at 27.)

This claim fails because, even assuming without deciding that the inscriptions on ancient coins constitute expression, the import restrictions satisfy the requirements of *United States v. O'Brien*, 391 U.S. 367 (1968).  Under *O'Brien*,

> [A] government regulation is sufficiently justified [1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* at 377.  The CPIA and the import restrictions at issue here satisfy this test.

First, it is undisputed that the imposition of import restrictions is "within the constitutional power of the Government."  Second, the restrictions further "an important or substantial governmental interest," namely combating "the pillage of archaeological or ethnological materials" where that pillage, and the resulting illegal trade, threatens the "cultural patrimony" of other countries.  19 U.S.C. § 2602(a)(1)(A).  *See also* Preamble, Cultural Property Convention (describing the purposes of the Convention).  By entering the Convention and implementing it through the CPIA, the President and Congress demonstrated their understanding that the pillage of archaeological materials, whether in the United States or abroad, constitutes a substantial threat that warrants a concerted international response.  Indeed, the ACCG does not argue that the government's interest in deterring such pillage is not "important or substantial."

Third, the government's interest in combating the pillage of archaeological materials is "unrelated to the suppression of free expression." Even if ancient coins convey information about ancient societies, the government's interest in combating the pillage of archaeological materials is unrelated to the suppression of the flow of that information.

Fourth, even if the import restrictions incidentally restrict the ability of coin collectors in the United States to access the information conveyed by ancient coins, that restriction is "no greater than is essential" to combat the pillage of those coins. ACCG seems to argue that the restriction is "greater than is essential" because it allows the government to prohibit the importation of coins without a known find spot, rather than limiting restrictions to coins that are proven to have been pillaged. The Convention and CPIA, however, illustrate that countries are in agreement that restricting the importation of particular types of coins, and thereby decreasing demand for those coins, is necessary to combat the trade in looted coins. Thus, even if the restrictions are in some sense over-inclusive because they prohibit the importation of coins that entered the market permissibly, the restrictions are not greater than is essential to deter pillage.

In fact, the CPIA, in anticipation of some First Amendment concerns, requires that import restrictions be "consistent with the general interest of the international community in the interchange of cultural property among nations for scientific, cultural, and educational purposes." 19 U.S.C. § 2602(a)(1)(D). To that end, it exempts certain material and articles that would otherwise be subject to import restrictions, such as certain items that have been held by museums in the United States for at least three years, *id.* § 2611(2), as well as certain items for "temporary exhibition or display." *Id.* § 2611(1). Moreover, while the import restrictions prohibit the importation and possession of protected coins, they do not prohibit coin collectors from learning the information contained in the inscriptions and motifs on those coins. Although there may be

some information that collectors can acquire only by inspecting original coins, much of the information that ACCG argues is communicated through coins is available from descriptions, photographs or other reproductions of those coins.  Therefore, "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of" the government's interest in combating the pillage of protected materials.

For these reasons, 19 CFR §12.104a and the designated lists are not impermissible content-based restrictions on speech.[29]

For the foregoing reasons, the amended complaint fails to state a cause of action on which relief can be granted with respect to the State Department and the Assistant Secretary of State.  The claims against them will be dismissed, and they will be dismissed as defendants in this action.

**B.**      **Judicial Review of Customs Actions**

In addition to challenging the actions of the State Department and the Assistant Secretary of State for ECA, ACCG challenges the actions of Customs and Border Protection and the Commissioner of Customs.  ACCG alleges that the agency and the Commissioner violated the APA and the Constitution, and exceeded their statutory authority, based on three alleged actions: (1) the promulgation of designated lists that included Cypriot and Chinese coins, (2) the seizure

---

[29] ACCG also argues that 19 CFR §12.104a and the designated lists are unconstitutionally overbroad.  (Pl.'s Opp'n at 29.)  "[A] law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'"  *United States v. Stevens*, __ U.S. __, 130 S. Ct. 1577, 1587 (2010) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449, n. 6 (2008)).  For the reasons discussed above, the application of the import restrictions to Cypriot and Chinese coins is not unconstitutional.  Because it does not allege any other unconstitutional applications of the CPIA, its overbreadth argument fails.  ACCG also alleged in its amended complaint that the State Department and Assistant Secretary acted unconstitutionally because they imposed import restrictions that (1) are a "prior restraint on protected speech" in violation of the First Amendment (Am. Compl. ¶161), (2) are "unconstitutionally vague," also in violation of the First Amendment (Am. Compl. ¶162), and (3) "restrict and burden plaintiffs' Fifth Amendment liberty collecting and trading in informational materials in the United States."  (Am. Compl. ¶167.)  They do not press these allegations against the State Department and Assistant Secretary in their briefs, and so the court will consider them abandoned.

of ACCG's coins based on those import restrictions, and (3) the placement of ACCG's Executive Director on a "'watch list' due to ACCG's decision to import coins of Cypriot and Chinese type for purposes of this test case." (Am. Compl. ¶102, 117; *see also* Pl.'s Opp'n at 21-22.) ACCG argues that the promulgation of the designated lists and the seizure of the coins based on those regulations violated the APA, IEEPA and the First and Fifth Amendments to the U.S. Constitution, and were *ultra vires*. ACCG alleges that the alleged placement of the executive director on a watch list violates the First Amendment.

### 1. APA Review

AGGC seeks judicial review under the APA of two actions by Customs: the promulgation of designated lists that included Chinese and Cypriot coins, and the seizure of ACCG's coins based on those regulations.[30] Unlike the actions discussed above, for which Congress assigned responsibility to the President, Congress conferred the authority for promulgating the designated lists on the Secretary of the Treasury, 19 U.S.C. § 2604, whose authority under the statute was later transferred to the Secretary of Homeland Security and delegated to Customs. 68 Fed. Reg. at 10,627. Thus, the bar on APA judicial review of the actions of the State Department, which are unreviewable under the APA as actions pursuant to delegated presidential authority, does not apply to the actions of Customs.

ACCG alleges that the promulgation of the designated lists by Customs was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." *See* 5 U.S.C. § 706(A)-(D). ACCG's specific factual allegations against

---

[30] ACCG also alleges that Customs violated the APA because it seized its coins without filing a complaint for forfeiture, in violation of the Fifth Amendment. (*See* Am. Compl. ¶107.) That claim will be discussed in the section on constitutional claims below.

Customs are somewhat unclear, because it does not clearly distinguish, in its amended complaint or in its briefs, between the actions of State and Customs. Because at this stage the court must construe the allegations in the light most favorable to ACCG, the court will assume that any claim for which ACCG does not specify whether it is brought against State or Customs is brought at least against Customs.

Nonetheless, ACCG does not allege any actions arguably attributable to Customs that would violate the APA and therefore does not state a claim under the APA on which relief can be granted. The categories of materials subject to CPIA import restrictions are set by the State Department and the requesting state party in the applicable Article 9 agreements. Once the State Department decides to include particular materials in an Article 9 agreement, Customs' authority is limited to promulgating the "list of the archaeological or ethnological material of the State Party covered by the agreement." 19 U.S.C. § 2604. Of the governmental actions challenged by ACCG, all of those preceding and including the negotiation of Article 9 agreements are the responsibility of the State Department, and thus are unreviewable under the APA. ACCG does not allege that Customs unilaterally added coins to the designated lists. Indeed, it acknowledges that the decisions to include coins in the Cypriot and Chinese designated lists were made by the State Department, not by Customs. Moreover, any allegation that Customs unilaterally imposed restrictions on coins would contradict ACCG's entire challenge to the State Department's actions. Thus ACCG's claims that Customs violated the APA by including coins on the designated lists will be dismissed.

### 2. *Ultra vires* review

In its Ninth Cause of Action, for judicial review of *ultra vires* actions, ACCG does not distinguish between its claims against the State Department and Assistant Secretary and those

against Customs and the Commissioner.  (*See* Am. Compl. ¶¶170-77.)  To the extent its claim

pertains to the process culminating in the decision to include Cypriot and Chinese coins in the

Article 9 agreements, it is discussed above in the context of the actions of the State Department

and Assistant Secretary.  To the extent ACCG aims its *ultra vires* claim against actions taken by

Customs and the Commissioner, the claim parallels ACCG's APA claim and will be dismissed

for the reasons stated above.

### 3.  Constitutional review

In addition to arguing that Customs violated the APA and acted *ultra vires*, ACCG argues

that Customs violated the First and Fifth Amendments to the U.S. Constitution.  ACCG's claim

that restricting the importation of coins violates the First Amendment is discussed above.  In

addition, ACCG has raised two constitutional claims concerning the actions of Customs and the

Commissioner: that they violated its Fifth Amendment rights by taking its coins without

promptly initiating forfeiture proceedings, and that they violated its First Amendment rights by

allegedly placing ACCG's Executive Director on a "watch list."

#### i.  *Delay in filing forfeiture action*

ACCG imported the coins on April 15, 2009.  Customs detained the coins and, in its May

15, 2009 amended Notice of Detention, requested that ACCG present the certification or

"satisfactory evidence" required by the CPIA and corresponding regulations.  After ACCG

disclaimed any ability to provide the certification or evidence requested, Customs seized the

coins on July 20, 2009.  ACCG formally contested the seizure on September 8, 2009.  ACCG

filed this action on February 11, 2010.  Thus approximately three months passed between

detention and seizure, another seven months passed before ACCG filed this lawsuit, and another

eighteen months have passed while this case has been pending, all without a forfeiture action

filed. ACCG argues that the government's delay in filing a forfeiture action violates the Due Process Clause of the Fifth Amendment. (*See* First and Second Causes of Action, Am. Compl. ¶¶107, 110-13.) ACCG obviously does not, however, seek dismissal of this action; rather, it requests that this court order the government to file a forfeiture action, and then consolidate it with this action. (Pl.'s Surreply at 11-12.) The government responds that the delay before ACCG filed this lawsuit was not unconstitutionally long, and the delay since it filed this lawsuit should not count against it because "the only reason that the government has not filed a civil forfeiture complaint is because of the pendency of the instant lawsuit." (Defs.' Reply at 11.)

The test for determining whether a delay in initiating forfeiture proceedings violates the Fifth Amendment is the same as the speedy trial analysis under the Sixth Amendment. *United States v. Eight Thousand Eight Hundred And Fifty Dollars ($8,850) in United States Currency*, 461 U.S. 555, 564 (1983). That test requires the court to balance four factors: "length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* "[N]one of these factors is a necessary or sufficient condition for finding unreasonable delay." *Id.* at 565. "Rather, these elements are guides in balancing the interests of the claimant and the Government to assess whether the basic due process requirement of fairness has been satisfied in a particular case." *Id.* ACCG's due process claim thus raises two issues: First, does the delay thus far violate ACCG's due process rights; in other words, if the government were to file its forfeiture action now, would the action be dismissed based on the Fifth Amendment? Second, if the delay thus far does not violate the Fifth Amendment, would further delay render forfeiture unconstitutional?

With respect to the first issue, in balancing the factors listed above, the court concludes that the delay does not violate ACCG's due process rights. The length of the delay since

ACCG's coins were seized has been substantial, and ACCG promptly asserted a claim to the coins. The length of delay and ACCG's assertion of its right thus cut towards a finding that the delay is unconstitutional. The other two factors, however—the reason for the delay and prejudice to ACCG—outweigh the length of delay and the claimant's assertion of its right. For all but five months of the time since the coins were seized, this case has been pending, involving extensive briefing and an oral argument on the government's motion to dismiss. The government has not filed a separate forfeiture action during that time because ACCG already had the federal forum it sought for review of the validity of the import restrictions. If the government were to file a separate action, the parties would have to litigate, and the court would have to adjudicate, the same issues in two cases at once. Accordingly, the reason for most of the delay cuts against a finding that the delay is unconstitutional.

Moreover, ACCG has made clear that its primary purpose in importing the coins at issue and then challenging their seizure was to challenge the validity of the import restrictions in federal court. Apparently it originally envisioned challenging the restrictions by filing a motion to dismiss in a forfeiture action. When several months went by without a forfeiture action having been filed, it filed this action seeking judicial review of the import restrictions. The government then filed its motion to dismiss, requiring this court to determine the reviewability (and, to the extent judicial review is available, the validity) of the import restrictions. Whereas in most delayed forfeiture cases a claimant is prejudiced because the government retains the claimant's property, ACCG does not claim any prejudice from the government's continued custody over the coins. Indeed, ACCG seeks neither a dismissal of this case nor an order precluding the government from initiating a forfeiture proceeding. Although it may have suffered some prejudice in the initial few months when it was awaiting the filing of a forfeiture

action, and expended some resources filing this action that it would not have expended defending a forfeiture action, the fact that ACCG has succeeded in bringing the import restrictions before a federal court for review mitigates any such prejudice. Therefore, the delay thus far does not violate ACCG's due process rights.

For these reasons, the court will dismiss without prejudice the First and Second Causes of Action in ACCG's Amended Complaint.

### ii. "Watch list" claim

ACCG claims that Customs violated the First Amendment when it placed ACCG's Executive Director on a "'watch list' due to ACCG's decision to import coins of Cypriot and Chinese type for purposes of this test case." (Am. Compl. ¶102, 117; *see also* Pl.'s Opp'n at 21-22.) The director's belief that he was placed on a watch list is "[b]ased on his interactions with Customs at the time as well as Customs' detention of Spink's property." (Am. Compl. ¶117.) By placing the director on a watch list, ACCG argues, Customs was retaliating against ACCG for filing this lawsuit, and "retaliation for filing a lawsuit is prohibited by the First Amendment protections of free speech and access to the courts." (Pl.'s Opp'n at 22.)

Customs argues that this claim should be dismissed for failure to exhaust administrative remedies. Congress required that the Department of Homeland Security "establish a timely and fair process for individuals who believe they have been delayed or prohibited from boarding a commercial aircraft because they were wrongly identified as a threat under the regimes utilized by [TSA], [CBP], or any other office or component of [DHS]." 49 U.S.C. § 44926(a). DHS has established such a program, which is called the Traveler Redress Inquiry Program (TRIP). *See Scherfen v. U.S. Dep't of Homeland Sec.*, No. 3:CV-08-1554, 2010 WL 456784, *6 (M.D. Pa. Feb. 2, 2010) (describing the program). Customs argues that ACCG and/or its executive director

must exhaust the remedies available through TRIP before seeking relief in this court, and therefore ACCG's claim should be dismissed.

When a party seeks judicial review of an agency decision, the party is generally required to "exhaust prescribed administrative remedies before seeking relief from the federal courts." *Volvo GM Heavy Truck Corp. v. U.S. Dept. of Labor*, 118 F.3d 205, 209 (4th Cir. 1997). Non-jurisdictional exhaustion, the type of exhaustion at issue here, *see Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1248 (D.C. Cir. 2004), "serves the twin purposes of protecting administrative agency authority and promoting judicial efficiency." *Volvo GM Heavy Truck Corp.*, 118 F.3d at 209 (citing *McCarthy v. Madigan*, 503 U.S. 140, 144-45 (1992)). The exhaustion requirement "provides an agency with an opportunity to correct its own mistakes with respect to programs it administers before it is haled into federal court" and also "serves to prevent piecemeal appeals." *Id.* (internal quotation marks and citations omitted).

A plaintiff challenging an agency's actions is excused from exhausting such remedies only if "the litigant's interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further." *McCarthy*, 503 U.S. at 146; *see also Volvo GM Heavy Truck Corp.*, 118 F.3d at 209 ("In determining whether exhaustion is required, federal courts must balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion.") Courts have excused plaintiffs from exhausting administrative remedies where, for example, (1) there are "no facts in dispute," *Avocados Plus*, 370 F.3d at 1247 (citing *McKart v. United States*, 395 U.S. 185, 198 n.15 (1969)); (2) "the disputed issue [is] outside the agency's expertise," *id.* (citing *McKart*, 395 U.S. at 197-98); (3) "the agency may not have the authority to change its decision in a way that would satisfy the

challenger's objections," *id.* (citing *McCarthy*, 503 U.S. at 147-48); (4) "requiring resort to the administrative process may prejudice the litigants' court action," *id.* (citing *McCarthy*, 503 U.S. at 146-47); or (5) the administrative process "may be inadequate because of agency bias." *Id.* (citing *McCarthy*, 503 U.S. at 148-49).

ACCG does not argue that any of these exceptions to the exhaustion requirement apply. Rather, it argues that because its allegations concern its own "First Amendment protections of free speech and access to the courts," it should not be required to exhaust the TRIP mechanism. (Pl.'s Opp'n at 22.)  This theory does not fall within one of the previously recognized exceptions to the exhaustion requirement.  Moreover, ACCG does not provide any reason why its interests in "immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further." *McCarthy*, 503 U.S. at 146.

For these reasons, the constitutional claims against Customs and the Commissioner will be dismissed.

### 4.  CAFRA

The Tenth Cause of Action in ACCG's amended complaint alleges that by failing to initiate forfeiture proceedings within ninety days of ACCG's submission of a claim for the seized coins, Customs violated CAFRA, 18 U.S.C. § 983(a)(3)(A).  That subsection requires that for certain types of forfeiture cases, the government must file a complaint for forfeiture within ninety days of the filing of a claim for the seized property.  *Id.*  If it does not file a complaint for forfeiture within ninety days, and cannot show "good cause" or "agreement of the parties," it must return the property to the claimant pending the filing of a complaint.  *Id.*  As a remedy, ACCG seeks an order to "compel agency action unlawfully withheld or unreasonably delayed."

5 U.S.C. § 706(1).  CAFRA, however, does not apply to seizures pursuant to "the Tariff Act of 1930 or any other provision of law codified in title 19."  18 U.S.C. § 983(i)(2)(A).  The CPIA is codified in title 19, and thus forfeiture actions under the CPIA are not subject to CAFRA's 90-day deadline.  Rather, delay in the filing of CPIA forfeiture actions is governed by the constitutional standard, discussed above.

Nonetheless, ACCG argues that its CAFRA claim remains viable because the government "darkly hint[s] that the coins in question may in fact be 'stolen' cultural patrimony of another country subject to the National Stolen Property Act" ("NSPA"), 18 U.S.C. §§ 2314-15.  (Pl.'s Opp'n at 20.)  It argues that because a claim under the NSPA could trigger forfeiture under 18 U.S.C. § 545, which is subject to CAFRA, its CAFRA claim remains viable.  The claim should only be dismissed, ACCG argues, if the government will "unequivocally disavow any claim that ACCG's coins were 'stolen.'"  (Pl.'s Opp'n at 20.)  The government has not, however, sought forfeiture under the NSPA.  If it were to do so, then CAFRA would apply, and the government would have to show "good cause" for why the ninety-day deadline should not apply.  But the court need not decide whether there is "good cause" for the delay, because the government's authority to seek forfeiture under the CPIA exists irrespective of whether the government would have authority to seek forfeiture under the NSPA.  Therefore, the Tenth Cause of Action will be dismissed.

### 5.  Mandamus

In addition to seeking a declaratory judgment and an injunction based on the alleged violations of the Constitution, the CPIA, and other statutes, ACCG seeks a writ of mandamus ordering Customs to return the coins and to remove ACCG or Spinks from a watch list.  Mandamus is an extraordinary remedy, and is available only if a plaintiff has "exhausted all

other avenues of relief," and if the defendant owes the plaintiff "a clear nondiscretionary duty." *Heckler v. Ringer*, 466 U.S. 602, 616 (1984). With respect to the watch list allegation, ACCG has not exhausted all avenues for relief, and with respect to neither allegation has it shown that Customs owes ACCG a "clear nondiscretionary duty." To demonstrate a clear, nondiscretionary duty, a plaintiff must show that "(1) the plaintiff's claim is clear and certain; (2) the defendant official's duty to act is ministerial, and so plainly prescribed as to be free from doubt; and (3) no other adequate remedy is available." *Barron v. Reich*, 13 F.3d 1370, 1374 (9th Cir. 1994) (internal quotation marks omitted); *see also Asare v. Ferro*, 999 F. Supp. 657, 659 (D. Md. 1998). A government official's duty is "ministerial" if "the law prescribes and defines a duty to be performed with such precision as to leave nothing to the exercise of discretion or judgment." *Asare*, 999 F. Supp. at 659 n.6. ACCG has not shown that Customs has a clear, nondiscretionary duty to return the coins. Therefore, its claim seeking a writ of mandamus will be dismissed.

## V.    CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss will be granted. The plaintiff's motion to strike the government's supplemental brief will be denied. A separate Order follows.


Aug. 8, 2011                                /s/
Date                                        Catherine C. Blake
                                            United States District Judge